**Juan PEREZ, Petitioner,**

v.

**David R. HARRIS, Warden, Greenhaven Correctional Facility, Respondent.**

**No. 77 Civ 835 (WCC).**

United States District Court,
S. D. New York.

Sept. 11, 1978.

---

See also D.C., 459 F.Supp. 1131.

Martin Obermaier & Morvillo, New York City, for petitioner; Carolyn H. Henneman, Henry Putzel, III, New York City, of counsel.

Mario Merola, Dist. Atty., Bronx County, New York City, for respondent; Alan D. Marrus, Asst. Dist. Atty., New York City, of counsel Barbara Gonzo on brief.

## OPINION AND ORDER

CONNER, District Judge.

The facts underlying the petition of Juan Perez for a writ of habeas corpus have been fully set forth in a prior memorandum, dated July 5, 1977, with which the Court assumes familiarity in the discussion to follow. A hearing was ordered at that time to determine the validity of Perez's claim that he had been denied his Sixth Amendment right to the effective assistance of counsel as the result of a conflict of interest on the part of his state-court trial lawyer, Mark Hermelin, who had represented both Perez and his co-defendant, Edward Pagan, at their murder trial in Supreme Court, Bronx County. Both men were convicted and sentenced to terms of imprisonment of twenty years to life. This Court appointed new counsel to represent Perez at the hearing on his Sixth Amendment claim, which was held January 30, 1978; Hermelin, called as a witness by the State of New York, was the only one to testify. For the reasons expressed below, the Court determines that there was no constitutional violation in this case and that the petition should therefore be denied.

We have the preliminary task of allocating the burden of persuasion on the issues of conflict and prejudice. The hearing testimony establishes—and the State does not dispute—that neither Perez nor Pagan was ever advised, by either defense counsel or the trial court, of the risks underlying the joint representation or of his right to have separate counsel. On direct appeals, the Second Circuit has held that the absence of an appropriate allocution by the trial court places the burden on the government to show lack of prejudice from the joint representation. *United States v. Carrigan,* 543 F.2d 1053, 1056 (2d Cir. 1976); *United States v. DeBerry,* 487 F.2d 448, 453 n. 6 (2d Cir. 1973). Whether this rule derives from the Court's supervisory powers and is therefore applicable only to cases on direct appeal, or is a constitutional mandate is a matter still not fully resolved. In a footnote in *Kaplan v. Bombard,* 573 F.2d 708, 714 n. 7 (2d Cir. 1978), the Court of Appeals indicated, without discussion, that the rule would apply on collateral as well as direct review. More recently, in *Salomon v. LaVallee,* 575 F.2d 1051 (2d Cir. 1978), another panel of the Court took note of the difficult constitutional questions involved in allocating the burden of persuasion on a petition for habeas corpus and held the issue in abeyance pending further proceedings. There, the district judge had assumed that the burden was on the petitioner rather than the State to prove prejudice from the joint representation at trial. Observing that the petition had come before the district court prior to the decision in *Kaplan v. Bombard, supra,* the Court of Appeals remanded with instructions that the burden be placed on the State to show the absence of prejudice rather than on the petitioner to demonstrate its existence. It commented that only if the State were unable to show lack of prejudice on remand would the allocation of the burden of proof be rendered significant. At that time, the Court said, if the State chose to appeal from the order of a new trial which would inevitably result, the issue would then be ripe for decision.

■ What guidance is available, therefore, suggests that, for the time being, district courts are expected to follow *Kaplan*

*v. Bombard* and apply the *Carrigan* rule on collateral review; thus, in cases in which it does not appear that petitioner was apprised of the potential conflict of interest in joint representation by counsel, the burden falls on the State to show lack of prejudice. The burden is on the State here in view of the absence of the necessary allocution of petitioner by the State court trial judge.

The Supreme Court's recent decision in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), however, has led petitioner to suggest that actual prejudice may now be irrelevant in assessing whether or not there has been a Sixth Amendment violation from joint representation at trial. According to petitioner, *Holloway* establishes that there is to be a "conclusive presumption of prejudice" wherever a trial court has sanctioned joint representation without having apprised a defendant of the risks involved or obtained from him a knowing waiver of his right to separate counsel.

*Holloway,* however, does not stand for nearly so broad a proposition. There, defense counsel had strenuously urged upon the trial court both prior to trial and again before the jury was empanelled the probability that there was a conflict of interest between his clients. There was nothing in the record in that case, moreover, to suggest that the risk of conflict which counsel "brought home to the court" by repeated motions, objections and representations was either without foundation in fact or "too remote" to warrant separate counsel. Still, the trial court failed either to appoint separate counsel or to conduct an inquiry on the conflict of interest issue. On those facts, the Supreme Court held that it would not be necessary for the petitioners to show that the conflict of interest had resulted in specific prejudice in order for them to establish a Sixth Amendment violation.

■ The Court did not purport to address the situation, however, in which defense counsel has "[done] nothing to advise the trial court of the actuality or possibility of a conflict between his several clients' interests." In such instance, it noted, appellate courts have differed on the precise level of conflict which must be shown in order to establish a constitutional violation. The view of the Second Circuit, as stated in *United States v. Lovano,* 420 F.2d 769, 773 (2d Cir. 1970), cited in the *Holloway* opinion, and cases thereafter,[1] is that "some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel." *"Big Black" a/k/a Frank Smith v. Regan,* 583 F.2d 72, at 75, n. 2, 2d Cir. 1978 and *Salomon v. LaVallee, supra* at 1053–54 n. 3 confirm that this is the governing standard even after *Holloway,* where no application for the appointment of separate counsel has been made below and the issue before the Court is the threshold one of whether a conflict of interest in fact existed. In the present case, therefore, petitioner may prevail in his application only if the State is unable to demonstrate the absence of specific prejudice, or a real conflict of interest, from the joint representation.

■ In its prior memorandum, this Court suggested the possibility that if Perez had had his own lawyer at trial, the latter might have been able to attack the credibility of Gonzalez's testimony marking Perez rather than Pagan as the man who had wielded the second murder weapon. From the bare trial record, Pagan appeared the more logical candidate as the second gunman because of his seemingly intimate involvement with Gordils and in the conspiracy against Ortiz. Moreover, Gonzalez's apparent fear of Pagan and financial obligation to him suggested that she might have tailored her testimony in his favor. The Court thus raised the question whether a strategy undermining the credibility of Gonzalez's testimony and seeking to cast the blame for the actual shooting on Pagan

---

1. *"Big Black" a/k/a Frank Smith v. Regan,* 583 F.2d 72, 2d Cir. 1978; *Salomon v. LaVallee,* 575 F.2d 1051 (2d Cir. 1978); *Kaplan v. Bombard,* 573 F.2d 708 (2d Cir. 1978); *United States v. Carrigan,* 543 F.2d 1053 (2d Cir. 1976).

would not have been a more productive one from the petitioner's standpoint than the defense of justification which was in fact advanced. An evidentiary hearing was ordered to determine whether, in rejecting such a strategy, "counsel made a sound tactical choice, based upon his thorough investigation of the circumstances of the incident and his interviews with witnesses," or whether, on the other hand, his decision "proceeded solely from considerations of loyalty to the co-defendant." In addition, taking note of the fact that Perez appeared to have only a single misdemeanor conviction on his record that would have been available to the prosecution for purposes of impeachment, the Court questioned counsel's decision not to place him on the witness stand so that he could testify in his own behalf.

On the basis of the evidence presented at the January 30, 1978, hearing, the Court is convinced that Hermelin was not laboring under a conflict of interest in his representation of Perez[2] and that he pursued a trial strategy that was appropriate under the circumstances of the case. It is true, that, in theory, a potential conflict of interest did exist. Hermelin knew prior to trial that Gonzalez would testify that only one of the assailants in addition to Gordils—Juan Perez—actually fired a weapon at the deceased. That fact alone suggested a divergence of interest between the two defendants so far as potential trial strategy was concerned. The investigation that Hermelin conducted prior to trial, however, established that there was no factual basis for contending that Pagan rather than Perez fired the second murder weapon. Gonzalez was the sole eyewitness to the crime and described the incident to Hermelin prior to trial exactly as she did later on the stand. She never deviated in her story. Hermelin's appraisal, from interviews with her and from his investigation, was that she was a truthful witness and that she testi-

fied "just as she saw it." To the extent that Gonzalez was partial to one or the other of the defendants, Hermelin's information led him to conclude that her closer ties were with Perez, not Pagan. He had no basis for believing that she would be predisposed to testify in favor of Pagan. Hermelin felt that it would have been impossible—either for himself or for a lawyer independently representing Perez—to have shaken her testimony with respect to the shooting.

▮ Petitioner is considerably off the mark in suggesting that Gonzalez's grand jury testimony might have been exploited to link Pagan, rather than Perez, to the murder weapon. Before the grand jury, Gonzalez had testified that Pagan had a gun at the time of the commission of the crime, while, at trial, she said that she was unable to recollect whether or not he was armed. This, however, in substance, was the sole point of distinction between her two accounts of the incident. Gonzalez did not implicate Pagan in the shooting in her prior testimony. She said, just as at trial, with complete certitude, that Perez and Gordils were the ones responsible. The minor divergence between her grand jury and trial testimony, therefore, with respect to Pagan's possession of a weapon, failed to impeach the credibility of her story. The fact that Hermelin did not introduce the grand jury minutes in evidence did not reflect partiality to Pagan but a realistic assessment of their essential uselessness from a strategic standpoint.

▮ A further contention made by petitioner at the hearing was that Hermelin's conflicting loyalty prevented him from painting Pagan as the more guilty party on the basis of his close association with Gordils. The Court credits Hermelin's testimony, however, that his failure to pursue such a tactic was based solely on his belief that it would have been contrary to Perez's inter-

---

**2.** Hermelin was not insensitive to the issue of conflict of interest generally. He was originally retained to represent all three defendants. Early in the case, however, he realized in discussions with the district attorney that there would be a potential conflict of interest if a single lawyer represented Gordils as well as Perez and Pagan. The defendants themselves concurred and Gordils thereafter retained separate counsel.

ests. Hermelin had learned from Gonzalez prior to trial that Perez's ties with Gordils were no less close or unsavory than Pagan's. Gonzalez informed him that the two were linked equally with Gordils in prior activities that involved trafficking in drugs and "protect[ing] their sphere of influence" and "eliminat[ing] competition" in the drug trade. In his investigation of these activities, Hermelin did not rely solely on the information furnished by Gonzalez but spoke to many others as well. Although he did not personally discuss with Perez the details of his past, Perez was informed by Hermelin of what Gonzalez had said.

■ On the basis of the information obtained, Hermelin judged that it would be crucial in the trial of the case to avoid questioning that might expose Perez's relationship to Gordils. His cross-examination of Gonzalez was therefore guarded. Hermelin feared that if he attacked her testimony with respect to her identification of Perez as the gunman—the veracity of which he did not have ground to question in any event—she would "blurt out" details of Perez's prior activities that would have an extremely damaging effect on the jury.[3] Even if her statements in this regard would not have been admissible in evidence, Hermelin reasoned, the negative impact on the jury would remain nonetheless.

Throughout the hearing, Hermelin steadfastly maintained that the limited scope of his cross-examination of Gonzalez did not derive from concern for Pagan. The Court finds his testimony credible and concludes that his examination reflected an informed evaluation of the facts, experienced assessment of the witness's credibility and appreciation of the dangers (to Perez) of over-intensive cross-examination.

It is to be noted, in this regard, that Hermelin received no information from either defendant prior to trial that cast doubt on Gonzalez's version of the incident. Far from seeking to cast the blame for the shooting on Pagan, Perez announced prior to trial that he would agree to plead guilty in return for the dismissal of the indictment against his co-defendant. The district attorney, however, did not agree to the arrangement. Neither defendant ever expressed dissatisfaction with Hermelin's representation.

■ With respect to his additional argument that Hermelin prejudiced his rights in not calling him to testify in his own behalf, Perez contends that Hermelin feared that the image he projected would adversely affect Pagan. The record does not support the inference, however, that any such purpose motivated Hermelin's advice to Perez not to take the witness stand. The fact that Hermelin considered the impression that Perez would make on the jury was not inconsistent with loyalty to his client's interests; he felt that Perez's general demeanor, attitude and manner of answering questions would militate against *his own* position at trial.

At any rate, the image Perez projected was only one factor affecting Hermelin's decision. Another was Perez's extensive criminal background. In addition to the two convictions referred to in the Court's prior memorandum (one of which would have been available for purposes of impeachment), Hermelin disclosed at the hearing that Perez had a long record of arrests. Under New York law, had Perez taken the witness stand in his own behalf, he would have been subject to cross-examination as to the facts underlying the arrests. *People v. Rahming,* 26 N.Y.2d 411, 419, 311 N.Y.S.2d 292, 259 N.E.2d 727 (1970); *People v. Schwartzman,* 24 N.Y.2d 241, 244, 299 N.Y.S.2d 817, 247 N.E.2d 642 (1969); Prince, Richardson on Evidence § 498 (10th ed. 1973). Hermelin recognized this and determined that Perez would be better served by not testifying.

Finally, Hermelin affirmed that, to his knowledge, there were no facts that Perez could have testified to that might have led

---

**3.** Hermelin explained that he was on safe ground with Gonzalez so long as he limited his questioning to the facts of the particular incident. Thus he felt there was no risk in emphasizing Pagan's non-involvement in the shooting of Ortiz.

to his acquittal. At the hearing before this Court, Perez did not elect to take the witness stand; moreover, in his petition, he has not indicated whether he would actually have desired to testify had he been represented by separate counsel or what the substance of his testimony would have been. Under the circumstances presented, the Court concludes that Hermelin's advice with respect to his not taking the stand was not the product of a conflicting loyalty and that no prejudice resulted to Perez's position at trial.[4]

■ Given the absence of a factual basis for holding Pagan, rather than Perez, responsible for the shooting of Ortiz, it cannot be said that the defense actually put forth for Perez prejudiced his rights or was unfavorably affected by a conflict of interest. Hermelin presented a consistent defense for his clients—that neither shared the intent possessed by the truly culpable party, Alberto Gordils. So far as Perez was concerned, the defense of justification, although far from compelling on this record, presented a clear issue of fact for the jury. The State is correct in observing that Hermelin placed emphasis on important items of evidence to support the defense: that the decedent had a gun and an extra supply of bullets, and that he fired his gun first, in response to which Perez shot back. Also, emphasizing that Gonzalez was "all bewildered, confused, and scared" during the incident, Hermelin sought to establish that Gordils rather than petitioner may have been the one who spoke to Ortiz on entering Gonzalez's apartment. During summation, Hermelin stressed the contrast between the self-defense nature of Perez's act and the "viciousness" of Gordils'. He argued that the only explanation for Gordils' conduct was that "there must have been some conflict" between him and Ortiz of which Perez and Pagan were ignorant.

Under the strategy pursued by Hermelin, Pagan's theory of defense and testimony directly supported the proposition that Perez was unwittingly led to Gonzalez's apartment on the night of the crime without knowledge of Gordils' intentions and that he fired his weapon only in self-defense. Pagan testified that on the night of July 28, 1973, Gordils spoke briefly with Millie Rodriguez and then told Pagan and Perez that he had something to take care of up the block. He asked them to accompany him "just in case this guy got rough with him." Gordils did not indicate to either of them the purpose of his visit or state an intention to harm or to kill Angel Ortiz.

Pagan further testified that both he and Perez were warned by Gordils immediately following the incident to keep their silence and that, on the evening of the incident, Perez told Pagan that "he didn't know . . . what was going to happen."

Despite the supportiveness of Pagan's testimony as presented at trial, petitioner urges that he was prejudiced because of Hermelin's inability to cross-examine Pagan on his behalf. The argument is that, through cross-examination of the co-defendant, an independent lawyer would have been able to stress Pagan's complicity—and, by the same token, petitioner's non-involvement—in events prior to and following the shooting, for example, in the numerous cash payments to Gonzalez, the setting-up of Ortiz and the Puerto Rican venture. To have pursued such a strategy, however, would have been to drive a wedge of antagonism between Perez and Pagan at trial. The State's point is well taken that had petitioner sought to implicate Pagan, Pagan, in all likelihood, would have sought to implicate petitioner in turn, "insuring a quicker guilty verdict for both." At the hearing, Hermelin stressed that his view of the case prior to trial was that Perez and Pagan would either stand or fall together.

---

4. The courts have noted, of course, that in joint representation cases a non-testifying defendant may suffer prejudice simply by virtue of his co-defendant's taking the stand. See, e. g., *Morgan v. United States,* 396 F.2d 110, 114 (2d Cir. 1968). The Court does not believe that that was the case here since Pagan's testimony exculpated Perez and was not inconsistent with the latter's position at trial. See *infra* at pp. 1147, 1148. See, *Kaplan v. Bombard,* 573 F.2d 708, 713 (2d Cir. 1978); compare, *Morgan v. United States,* supra; *United States v. Carrigan,* 543 F.2d 1053 (2d Cir. 1976).

In the last analysis, without a convincing basis for maintaining that Pagan actually shot Ortiz, stressing his complicity (and Perez's lack of participation) in the planning and aftermath stages of the crime would have been of limited or no utility. It would obviously not have absolved Perez of murder. The strategy devised by Hermelin of joining the defendants in a united front presented a potentially greater chance of success. The *Court* believes that, considering all the relevant factors, separate, independent counsel would have made the same choice.

Although Hermelin laid greater stress at trial on the defense of Pagan, the necessary elements in support of Perez's position were adequately presented to the jury. Of the two defendants, Pagan appeared, on a comparative basis, in a more sympathetic light. In large part, however, so long as the defendants were tried jointly, Perez would have suffered by comparison regardless of whether they had had common counsel. Pagan did not have a criminal record (and so could testify without risk of impeachment on that basis), was a veteran honorably discharged from the armed forces and was not implicated in the ruthless slaying itself. Still, the jury brought in a verdict of guilty against him. There is no reason to believe that if equal emphasis had been placed on Perez's defense, he would have been acquitted.

For the foregoing reasons, the Court concludes that Perez was not deprived of his right to the effective assistance of counsel and that his petition should therefore be denied.

SO ORDERED.