Lawrence P. STROUSE, Jr., Petitioner,

v.

Arthur LEONARDO, Superintendent, Great Meadow Correctional Facility; John Santucci, District Attorney County of Kings, Respondents.

No. 88 CV 746.

United States District Court, E.D. New York.

June 26, 1989.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed below, the petition is denied.

### FACTS

On July 28, 1980, following a jury trial, petitioner was convicted of two counts of second degree murder, burglary in the first degree and conspiracy to commit murder in the second and fourth degrees. Petitioner was sentenced to concurrent terms of 25 years-to-life imprisonment on each murder count, and 8⅓–to–25 year imprisonment on the burglary count. On the conspiracy counts, petitioner was sentenced to concurrent terms of 8⅓–to–25 years on the second degree conspiracy count and 0–to–4 years on the fourth degree conspiracy count. The trial court ordered that the sentence on the conspiracy counts run consecutively to the sentence on the murder and burglary counts.

Although the convictions were unanimously affirmed on appeal, the Appellate Division, Second Department, modified the sentence to provide that the sentence on each conviction run concurrently with the others. *People v. Strouse,* 96 A.D.2d 604, 464 N.Y.S.2d 1017 (2d Dep't 1983). Leave to appeal to the Court of Appeals was denied on November 9, 1983. *People v. Strouse,* 60 N.Y.2d 971, 471 N.Y.S.2d 1040, 459 N.E.2d 205 (1983). During the appellate proceedings, petitioner was represented by Morgan Kennedy, Esq.

Petitioner then sought a writ of habeas corpus in this Court (85 CV 4361). On May 29, 1986, the Court dismissed the petition without prejudice for failure to exhaust state remedies. A subsequent motion in Supreme Court, Queens County to vacate the conviction pursuant to N.Y.C.P.L. § 440.10 was unsuccessful. On February 5, 1987, Supreme Court denied the motion without an evidentiary hearing. Leave to appeal to the Second Department was denied on October 5, 1987.

Morgan Kennedy, New York City, for petitioner.

Steven J. Rappaport, John Santucci, Dist. Atty., Queens County, for respondents.

Having now exhausted his state remedies, petitioner renews his petition for habeas corpus relief alleging the following grounds: denial of his constitutional right to a fair trial based on prosecutorial misconduct; abridgement of his rights secured by the fifth amendment because statements involuntarily made by him were introduced at trial; and denial of his sixth amendment right to effective assistance of counsel because (1) trial counsel labored under a conflict of interest and (2) trial counsel "conducted a perfunctory and inactive defense."

The victim of the murder that forms the basis of these convictions is petitioner's mother, Nancy Strouse. Briefly stated, the theory of the prosecution's case was that petitioner hired one Barry Weisbrot to murder Mrs. Strouse and burglarize her apartment to enable petitioner to collect insurance proceeds and to inherit under Mrs. Strouse's will. Weisbrot was tried and convicted in a separate trial. James J. Calley, petitioner's trial counsel, prepared and witnessed Mrs. Strouse's will and was named alternate executor in the event petitioner, named as primary executor and sole beneficiary, predeceased Mrs. Strouse. Therein lies the alleged conflict of interest. This is most serious ground of those alleged in the petition and the one that the Court will consider first.

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

To establish an ineffective assistance of counsel claim, petitioner must satisfy the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must show that his counsel's errors fell below an objective standard of reasonableness and that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

### A. *Conflict Of Interest*

██ The right to effective assistance of counsel that is guaranteed by the sixth amendment has two elements: defendant's right to have reasonably competent counsel, *see McMann v. Richardson*, 397 U.S. 759, 770–71, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970), and defendant's right to the undivided loyalty of his counsel, *see Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981).

The Supreme Court has outlined the standard for determining whether an attorney's conflict of interest renders ineffective his representation of a criminal defendant. "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). When "the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance'", *Strickland, supra*, 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan, supra*, 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718), prejudice is presumed.

An actual conflict of interest arises when the personal interests of defense counsel are " 'inconsistent, diverse or otherwise discordant' with those of his client and which affect[ ] the exercise of his professional judgment on behalf of his client." *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 135 (3rd Cir.1984) (quoting Model Code of Professional Responsibility EC 5–14 (1980)).

The entire will, including the part naming Calley as alternate executor, was read into the record at trial to establish petitioner's motive. No inquiry was made by the trial court, however, about a possible conflict between Calley's representation of petitioner and his involvement with Mrs. Strouse's estate. There is no question that the court was aware of the problem because it agreed to adjourn petitioner's sentencing date to accommodate the probate schedule. Petitioner makes no allegation that he was unaware of Calley's former employment by his mother. Indeed, petitioner admitted at his appearance before

the grand jury that he had seen the will before his mother was murdered. Tr. at 881. No objection to the representation was made at trial.

■ The question remains, however, whether a conflict existed. Absent a conflict, the trial court had no duty to inquire about a defendant's choice of counsel. *See Cuyler, supra,* 446 U.S. at 347, 100 S.Ct. at 1717. Petitioner argues that Calley's status as alternate executor of the estate provided a motive for Calley to act as a less than forceful advocate. The theory advanced is that petitioner's conviction would bar him from acting as executor. Under the terms of the will, Calley would then be appointed executor and be eligible to collect compensation therefor from the estate. The will, however, provides that Calley be appointed executor only if petitioner predeceased his mother. As it turned out, Peter Gregory Strouse, petitioner's brother, who was not provided for under the will, became the Administrator, c.t.a. Calley was not appointed executor and never received a fee.

Petitioner asserts that these facts give rise to an actual conflict of interest and that since there was no inquiry made by the trial court, no valid waiver of the conflict was procured.

■ Under the circumstances presented here, the Court must disagree. There is no dispute that the total estate was valued at $80,000—$100,000. Under applicable New York law, Calley would have been entitled to a statutory fee of 5% of the estate, or $4,000—$5,000. *See* N.Y.Surr.Ct.Proc. Act § 2307(1)(a). The evidence at trial, however, established that petitioner, who lived with his mother, was only periodically employed and unable to afford his own car or living accommodations. From the evidence, one could reasonably conclude that petitioner would be unable to pay Calley for the counsel fees that were incurred during this lengthy murder trial. Had petitioner been acquitted, he would have acted as executor and inherited the entire estate. Thus, if contrary to ethical standards, *see* EC 5–6, money played any part at all in the vigor of Calley's performance as defense

counsel, then he would have stood to gain significantly more than a paltry $4,000—$5,000 if he succeeded in securing an acquittal. Petitioner's theory simply fails to withstand careful scrutiny.

■ Petitioner also claims that by virtue of this prior representation, Calley must have received confidential communications by Mrs. Strouse. At the time of the investigation and trial, Calley's representation of Mrs. Strouse was limited to preparing and witnessing her will. Even if Calley had become privy to privileged information in his representation of Mrs. Strouse, her death would have barred Calley from testifying, on behalf of the state or the defense, about any privileged subject matter; and this would be true regardless of who represented defendant at his criminal trial. *See* N.Y.C.P.L.R. § 4503(a); *Matter of Cunnion,* 201 N.Y. 123, 94 N.E. 648 (1911). The Court is therefore unable to discern any actual conflict arising out of either of these capacities.

■ If Calley had acted as executor, he would have been responsible for "(1) reduc[ing] to possession the personal assets of the testator; (2) ... pay[ing] the testator's debts; (3) ... pay[ing] legacies; and (4) ... distribut[ing] the surplus, if any, among the next of kin." Restatement Second, Trusts § 6 at 19 (1959); *see* A. Scott, The Law of Trusts § 6 at 58 (1967). These duties are more specifically defined in New York's Estate Powers & Trusts Law § 11–1.1. It has not suggested how Calley's expectation of performing these obligations poisoned the duty that he owed to petitioner. Even if Calley's representation of petitioner did not preclude him from qualifying as executor (a dubious assumption), the mere possibility of acting as executor does not necessarily create an actual conflict of interest in a criminal proceeding.

■ The Court is mindful that when counsel is "corrupted by conflicting interests" it is "difficult to measure the precise effect on the defense." *Strickland, supra,* 466 U.S. at 692, 104 S.Ct. at 2067. Nevertheless, a state prisoner seeking a writ of habeas corpus must demonstrate

that the alleged conflict "affected his lawyer's performance." *Cuyler, supra*, 446 U.S. at 350, 100 S.Ct. at 1719. While, as more fully discussed below, petitioner has alleged various errors made by Calley at trial, he fails to demonstrate that the errors were precipitated by a conflict of interest. No showing is made that counsel of comparable competency would have performed differently in the absence of this conflict.

Based on the foregoing, the Court concludes that, at best, petitioner has alleged no more than the possibility of a conflict of interest at his trial. A mere possibility, however, "is sufficient to impugn a criminal conviction." *Id.* Moreover, petitioner has failed to demonstrate how this potential conflict affected the presentation of his defense.

### B. *Competency*

Petitioner advances the following alleged errors of counsel that support his claim that Calley was constitutionally ineffective: (1) Calley permitted the police to interrogate petitioner; (2) Calley advised petitioner to testify before both the grand and petit juries; (3) Calley failed to file motions before trial for orders precluding evidence of prior bad acts and changing the venue of the trial; (4) Calley failed to interview and call character witness; and (5) Calley failed to request the trial court to charge the jury that one witness, Barbara Travers, was an accomplice.

### 1. Petitioner's Interrogation and Testimony

### a. *Facts*

#### (i) The Police Interrogation and the Grand Jury Appearance

After the murder, the police found petitioner in the possession of his mother's car, which had been reported stolen. The police asked petitioner to go to the police station, but he refused until he had consulted an attorney. Shortly thereafter, petitioner and Calley spoke. Calley and three of petitioner's friends accompanied petitioner to the stationhouse on January 28, 1979, where petitioner was questioned by a detective in the presence of Calley and petitioner's brother, Peter. The taped interrogation was interrupted on several occasions while petitioner consulted with Calley. The tape recording of the interrogation was played at trial. Petitioner told the detective that although he was angry at his mother, that he spoke to Weisbrot about having her apartment burglarized and having her killed, he never intended for it to happen and actually tried to prevent it. On the direct appeal of his conviction, petitioner described his statement to the police as follows:

> as soon as [petitioner] and Weisbrot discussed a burglary and a murder, [petitioner] voluntarily and completely renounced any criminal purpose, and withdrew from participation.... As soon as the statements about burglary and murder were made, [petitioner] retracted everything, told Weisbrot that he had not meant a single word he had said, and told Weisbrot to just forget the whole thing.... Weisbrot responded that he knew that [petitioner] didn't truly mean all of the things he had said. Weisbrot said he wouldn't do those crimes because he knew that [petitioner] would crack. Later that day, [petitioner] called Weisbrot's lover, Barbara Travers, several times to renounce any criminal intent and to seek assurance that Weisbrot would *not* commit the crimes.

*People v. Strouse*, Defendant–Appellant's Brief on Appeal at 23–24 (emphasis in original) ("Petitioner's Appellate Brief").

Despite the conceded exculpatory nature of the statement, and the fact that petitioner testified at trial that it was his wish to make a statement to the police, *see* Tr. at 1621, petitioner now charges that it was error for counsel not to advise him to invoke his fifth amendment privilege.

Before the grand jury, petitioner testified

> that he told Weisbrot *not* to murder his mother, and Weisbrot said he wouldn't because he knew that [petitioner] could not stand the pressure. [Petitioner] told Travers that he didn't want a burglary and a murder to actually take place, and

she assured him that these crimes would *not* take place.

Petitioner's Appellate Brief at 24.

Petitioner now claims that permitting this grand jury appearance was also an error of constitutional magnitude, notwithstanding that petitioner has admitted that it was his wish to so testify. *See* Tr. at 1609.

### (ii) The Trial Testimony

Petitioner's testimony at trial was essentially consistent with his prior statements except in one material respect. Apparently abandoning his renunication defense, petitioner stated that although he and Weisbrot discussed killing Mrs. Strouse and burglarizing her apartment, he never agreed to the scheme and thought that Weisbrot was speaking in jest. He explained that the inconsistency was due to his poor health when he was questioned by the detective and his distress and confusion at the time he was before the grand jury.

Apparently confusing the defense that no agreement existed with the defense of renunciation, petitioner argued to the Second Department that his trial testimony "establishes that he completely renounced any criminal purpose and withdrew from participation well in advance of the commission of the crimes." Petitioner's Appellate Brief at 25.

### b. *Discussion*

The Court is not persuaded that Calley's conduct in permitting petitioner to make a statement to the police and allowing him to testify at the grand jury and at trial was objectively unreasonable within the meaning of *Strickland.* In making this determination, the law requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065. Accordingly, petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel*

*v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

### (i) The Police Interrogation and The Grand Jury Testimony

■ The right to effective assistance to counsel is grounded in the sixth amendment, *Strickland, supra,* 466 U.S. at 684–85, 104 S.Ct. at 2062–63, and "attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). In the Second Circuit, the right does not attach until the defendant is indicted. *See In re: Grand Jury Subpoena Served Upon Doe,* 781 F.2d 238, 244 (2d Cir.1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). Although counsel may be constitutionally required at some earlier stage in the proceeding, that right to counsel is secured by the fifth amendment to protect the privilege against self-incrimination "rather than to vindicate the Sixth Amendment." *United States v. Gouveia,* 467 U.S. 180, 188 n. 5, 104 S.Ct. 2292, 2297 n. 5, 81 L.Ed.2d 146 (1984).

The statements petitioner made to the police and his testimony before the grand jury occurred before he was indicted. Since petitioner's sixth amendment right to counsel had not yet attached at the time these alleged errors occurred, he cannot argue an abridgement thereof. Nevertheless, the court briefly notes that the claim is without merit.

■ It was petitioner's avowed desire to make a statement to the police and testify before the grand jury. *See* Tr. at 1609, 1621. As petitioner explained: "I wanted to give a statement. I thought I could try to explain.... I wanted to find out the details [of Mrs. Strouse's murder]." Tr. at 1621. Petitioner, who was not under arrest, volunteered to go to the police station after the police discovered him in possession of his mother's reportedly stolen car. At trial, petitioner testified that the statements he made were voluntary and not coerced. The people who accompanied petitioner to the police station were briefing the police about the murder. Even with the benefit of hindsight, the Court cannot

conclude that Calley erred in permitting his client to speak to the police about the murder of his mother.

■ Petitioner's argument regarding the soundness of Calley's judgment in allowing petitioner to testify before the grand jury fails under the same analysis. Petitioner testified at trial that he spoke with Calley before the appearance, that he wanted to testify, and that his lawyer accompanied him to the grand jury. Petitioner now claims that at the time of his grand jury appearance he was suffering from emotional trauma and drug withdrawal, and told Calley that he did not want to testify.

The inconsistency notwithstanding, even were this Court to conclude that these latter claims are true, that it was solely upon Calley's advice that he testified and that such advice was outside the range of competency, no prejudice resulted from the introduction at trial of the grand jury minutes. Petitioner has not alleged, and, after a thorough review of both statements, the Court is unable to support a conclusion, that petitioner's grand jury testimony was inconsistent with his statement to the police. At worst, the introduction at trial of the grand jury minutes was cumulative. Thus, the Court must conclude that petitioner has failed to sustain his burden of demonstrating that Calley's advice was constitutionally defective and that his trial was prejudiced thereby.

### (ii) The Trial Testimony

■ It is clear from the record that counsel's strategy at trial was to portray petitioner as a "fool," a "patsy," Tr. at 1712—someone who was "simple-minded," Tr. 1730, "used" and taken advantage of. Tr. 1723. That Calley allowed petitioner to waive his fifth amendment privilege and testify before the grand jury was entirely consistent with this strategy. This was not an ordinary murder trial—a son was charged with the murder of his mother. Petitioner had the opportunity to explain his relationship with Mrs. Strouse to the jurors, Tr. at 1327–1329; refute the testimony of Joan Chiappi, petitioner's ex-wife, who testified that petitioner had once pushed his mother down a staircase and on

another occasion struck her. *Compare* Tr. 1245–1265 (Testimony of Chiappi) *with* Tr. at 1505–1509 (Testimony of Petitioner). The jurors were also given the opportunity to observe the grief petitioner suffered.

Petitioner had no prior criminal record. Thus, there were no prior convictions with which he could be impeached. *Compare Smith v. Regan*, 583 F.2d 72, 76 (2d Cir. 1978) (counsel's decision not to have defendant testify sound in light of prior convictions). The statements made to the police and the grand jury testimony were already in evidence at the time petitioner took the stand. Evidence of prior bad acts as elicited from Joan Chiappi were also in evidence. In sum, there was little to lose by testifying at trial.

The Court concludes that petitioner has failed to overcome the presumption that Calley's conduct was simply the employment of trial strategy. Moreover, petitioner has failed to allege, much less demonstrate, that had he not testified, a reasonable probability exists that he would have been acquitted.

### 2. Calley's Failure to Make Pre–Trial Motions

Petitioner also seeks to fault Calley for his failure to make two pre-trial motions. Petitioner alleges that Calley was ineffective because he failed to seek suppression of evidence, introduced through Joan Chiappi, of petitioner's alleged prior bad acts. As discussed above, Chiappi testified that petitioner once struck Mrs. Strouse and pushed her down a staircase.

■ The law in New York is clear. Other crimes, wrongs or acts are inadmissible if offered solely as evidence of criminal disposition. Where, however, such evidence is relevant to prove motive, intent, the absence of mistake, identity, or a common plan or scheme, it is admissible. *See People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 (1901). From the outset, petitioner claimed that he renounced his participation in the plot to kill his mother. He thus put intent squarely in issue. The evidence that petitioner had previously attempted to harm his mother was relevant, and the

murder charged in this case was not one where intent may be inferred from the act itself. *Compare Molineux, supra.* Based on an independent review, the Court cannot conclude that the prejudice flowing from the introduction of this evidence outweighed its prejudicial effect. *See People v. Alvino,* 71 N.Y.2d 233, 241–43, 525 N.Y. S.2d 7, 11–12, 519 N.E.2d 808, 811–13 (1987). Accordingly, Calley did not err in failing to seek its preclusion.

■ Petitioner also claims that his constitutional right to counsel was abridged when Calley failed to move to change the venue of the trial. Petitioner characterizes his trial as "notorious" and appends to his petition various newspaper accounts thereof to support his claim that he could not and did not get a fair trial in Queens. This claim must be rejected. There is no allegation that any of the jurors were affected by the media coverage. The trial judge instructed the jurors at the commencement of the trial that they were not to speak with anyone about the case, Tr. at 9, and not to "listen or read any account of the case if it appears in the newspaper or other media." *Id.* at 10. The trial minutes are replete with instructions by the judge to heed that warning. Petitioner has simply failed to show that the jurors disregarded the admonition.

Having failed to demonstrate that either of these motions would have been successful, petitioner has failed to satisfy the prejudice factor of the *Strickland* test. *See Christian v. McKaskle,* 731 F.2d 1196, 1200–01 (5th Cir.1984); *see also United States v. Ditommaso,* 817 F.2d 201, 215 (2d Cir.1987); *United States v. Aulet,* 618 F.2d 182, 189 (2d Cir.1980).

3. Calley's Failure to Interview and Call Witnesses

■ Petitioner further claims that Calley's failure to interview and call vari-ous "character" witnesses constitutes defective assistance.[1] Petitioner submits with his petition affidavits from the following people who claim that they would have testified for the defense:

(a) Diane Filipas—petitioner's ex-fiance. Ms. Filipas was subpoenaed by the State to testify at trial. She states that Calley never called her; that she would have testified for the defense; that her pre-trial statements to the police were coerced; and that her testimony at trial would have been different if she was called by the defense.

(b) Richard Rhodes—a friend of the petitioner. Mr. Rhodes states that he was a witness to certain unspecified events after the murder, including the wake; and that although he would have testified, Calley never contacted him about testifying for the defense.

(c) Ann Bakelman Bannout—a friend of the petitioner. Ms. Bannout states that she could testify about the good relationship that existed between petitioner and his mother; that she called Calley to offer her assistance and that he never contacted her when the trial ensued.

(d) Frances McPhillips Vincente—a friend of the petitioner. Mrs. Vincente testified for the State and claims that she would have testified about "certain relevant incidents and conversations"; that she called Calley after being approached by the police for a statement and told Calley that she wanted to be a defense witness; and that Calley did not question her and did not call her as a witness.

1. The parties err in categorizing the potential witnesses as character witnesses. Petitioner argues that the witnesses should have been called to testify about the relationship that existed between him and his mother. Character evidence, however, is testimony by a witness qualified to testify about the *reputation* the defendant enjoys in the community for the particular trait in-volved in the crime charged—*e.g.:* truthfulness in a perjury prosecution or peacefulness in an assault prosecution. None of the prospective witnesses have indicated they are qualified to testify about a particular relevant character trait. Rather, the statements speak of their lay opinion of the nature of this particular mother-son relationship.

(e) Mary Bisogno Vecchio—a friend of the petitioner. Ms. Vecchio states that she called Calley to offer her services as a witness to the relationship between petitioner and his mother; and that Calley did not interview her and did not call her as a witness.

(f) Lawrence P. Strouse, Sr.—petitioner's father who was divorced from petitioner's mother and living in Florida at the time of the murder. Mr. Strouse states that he asked Calley to call him as a witness to testify about the operation of the door that Weisbrot used to gain entry to Mrs. Strouse's apartment; that petitioner is "excessively verbal and hyperbolic" and that his words were meaningless and made only in jest; and that petitioner and his mother had a good relationship. Mr. Strouse further states that Calley refused to call him as a witness.

(g) Dominic Passaro—a friend of the petitioner. Mr. Passaro states that he could testify about the good relationship between petitioner and his mother; and that he believes petitioner knew that he could have so testified and that he further believes that petitioner told Calley about Passaro's willingness to be called as a witness for the defense, but Calley never contacted him.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland, supra,* 466 U.S. at 691, 104 S.Ct. at 2066.

The Court will assume the truth of the allegations made in the foregoing affidavits—they are completely uncontroverted by the State. The Court will further assume that Calley conducted no independent investigation and that such failure, particularly in a murder prosecution, is objectively unreasonable and constitutionally unsound.

This conclusion, however, entitles petitioner to relief only if he can also demonstrate that this unprofessional conduct prejudiced his trial. The Court finds that petitioner has failed to make an adequate showing. The affidavits on their face fail to demonstrate prejudice. Most of the facts set forth therein are vague and immaterial—precious little is said about the specific facts as to which each affiant would have testified. Of the few relevant statements made, no showing is made that the affiant is competent to testify about them or that the proffered testimony, which as gleaned from the affidavits is hearsay, would otherwise be admissible.

The only exception to the foregoing analysis of the affidavits are those prospective witnesses who would have testified about their lay opinion of the relationship that existed between petitioner and Mrs. Strouse. As discussed above, however, petitioner testified about his relationship with his mother. Moreover, several witnesses at trial who had known petitioner and his mother for several years, testified that they shared a healthy relationship. *See* Tr. at 483 (Testimony of Diane Filipas); *id.* at 1109 (Testimony of Kathy Shannon); *id.* at 1216 (Testimony of Nicholas Labriola); *id.* at 1676 (Testimony of Tony Daniels). Had Calley called additional witnesses, their testimony would have been merely cumulative. None of the affidavits demonstrates competent exculpatory evidence, and neither of the affiants who were also trial witnesses (Filipas and McPhillips), renounce their incriminating testimony.

Based on the foregoing and in light of the overwhelming evidence of guilt adduced at trial, the Court cannot conclude that "the result of the proceeding would have been different," *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068, if Calley had called the affiants as witnesses for the defense. *See Washington v. Watkins,* 655 F.2d 1346, 1360 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). A review of the evidence discloses that "the decision not to call [the witnesses] can easily be justified." *Trapnell v.*

*United States,* 725 F.2d 149, 156 (2d Cir. 1983).

### 4. Calley's Failure to Request An Accomplice Charge

 Petitioner's final ground in support of his ineffective assistance of counsel claim surrounds Calley's failure to request the trial court to charge the jurors that Barbara Travers was an accomplice witness.

At trial, Travers testified that she introduced petitioner to Weisbrot and was present when petitioner and Weisbrot hatched the conspiracy and took photographs of Mrs. Strouse's property in anticipation of an insurance claim. She asked them what they were talking about, to which Weisbrot replied "Don't worry." Petitioner testified that Travers asked to see Mrs. Strouse's mink and saw Travers look into Mrs. Strouse's bedroom. Travers also testified that she was present at Mrs. Strouse's wake where she asked Weisbrot if he killed Mrs. Strouse and where the victim's car was located. Travers stated that Weisbrot denied committing the murder. Finally, she testified that she went out dancing and drinking with petitioner and a group of friends after the wake.

The trial court could not have properly charged the jury that Travers was an accomplice, unless an evidentiary showing had been made that she "reasonably [could be] considered to have participated in the offense charged." *People v. Spiegel,* 60 A.D.2d 210, 212, 400 N.Y.S.2d 73, 74 (1st Dep't 1977), *aff'd,* 48 N.Y.2d 647, 421 N.Y. S.2d 190, 396 N.E.2d 472 (1979); *see People v. Cobos,* 85 A.D.2d 893, 894, 446 N.Y.S.2d 749, 751 (4th Dep't 1981), *aff'd,* 57 N.Y.2d 798, 455 N.Y.S.2d 588, 441 N.E.2d 1106 (1982). Based on the trial testimony, it is quite clear that Travers was an interloper. There is no proof that her conduct amounted to "participating" in a crime. Accordingly, Calley did not err in failing to request an accomplice charge and such failure did not prejudice petitioner.

### C. *Conclusion*

The Court concludes that none of the grounds advanced demonstrate that petitioner was denied his sixth amendment right to effective assistance of counsel. As the foregoing discussion indicates, defense counsel's conduct was objectively within the range of competency and to the extent that his failure to investigate and call witnesses was unreasonable, such conduct did not prejudice petitioner.

The Court further concludes that petitioner has failed to demonstrate that Calley was laboring under an actual conflict of interest and that the conflict affected Calley's presentation of the defense. No actual conflict of interest existed. Further, petitioner has not shown, and the Court is unable to discern, how any of the alleged errors in counsel's performance occurred by operation of the alleged conflict. *Compare United States v. Aiello,* 814 F.2d 109, 114 (2d Cir.1987) (failure to call defense witness linked to defense counsel's prior representation of him); *United States v. Iorizzo,* 786 F.2d 52, 58 (2d Cir.1986) (defense counsel's prior representation of key prosecution witness precluded cross-examination); *United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984) (defense counsel who engaged in similar criminal conduct possessed impaired ability to conduct vigorous defense). "When failure to undertake a possible line of defense constitutes a realistic tactical choice rather than a reflection of loyalty to another client, the failure does not establish the basis for a claim of ineffective assistance of counsel." *United States v. Aiello,* 681 F.Supp. 1019, 1024 (E.D.N.Y.1988) (citing *Smith v. Regan,* 583 F.2d 72 (2d Cir.1978); *Perez v. Harris,* 459 F.Supp. 1141 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979)).

## II. THE PROSECUTOR'S CONDUCT

 Petitioner's next ground in support of a writ of habeas corpus surrounds the prosecutor's conduct at trial. It is argued that the prosecutor engaged in various abusive trial tactics that resulted in a violation of petitioner's constitutional right to a fair trial. The most serious of the alleged abusive tactics include: (1) introducing photographs of the crime scene into evidence; (2)

attacking petitioner's credibility through the use of prior inconsistent statements; (3) introducing evidence that petitioner was a homosexual as evidence demonstrating the source of friction between petitioner and his mother; (4) introducing evidence that petitioner was financially unstable as motive evidence; and (5) arguing to the jury in summation that petitioner fabricated evidence and had a guilty conscience.

A thorough and independent review of the record fails to support petitioner's claim. None of the alleged tactics was unfair. They simply do not rise to a level where it could reasonably be concluded that petitioner was denied a fair trial. *See Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Evans v. LeFevre*, 490 F.Supp. 813, 818 (S.D.N.Y. 1980); *see also United States v. Torres*, 845 F.2d 1165, 1172 (2d Cir.1988).

### III. VOLUNTARINESS

Finally, petitioner claims that his statements to the detective on January 28, 1979 were involuntary and therefore should have been suppressed at trial.

■■■ Whether the statements were voluntary requires an examination of the totality of the surrounding circumstances. *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). The factors the Court must consider include petitioner's characteristics, the conditions of the interrogation and the conduct of the law enforcement officials. *See id.* at 901–02.

■■■ Petitioner avers that at the time of the interrogation, he had not slept in four days and was under the influence of tranquilizers and amphetamines. This weakened physical and emotional condition allegedly rendered petitioner unable to either answer questions intelligently or waive his fifth amendment privilege. This claim is wholly without merit.

Several months later, petitioner testified at trial that he wanted to make the statement. Tr. at 1621. As discussed more fully above, petitioner was not under arrest and went to the police station on his own volition. Petitioner does not allege, and an independent review of the transcript of the statement does not disclose, that the law enforcement officials conducted themselves in such a manner that his free will was overborne. Mere absence of complete command of one's mental faculties does not render a statement involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* The Court concludes, therefore that petitioner's statement was voluntary and its use as evidence against him at trial did not offend due process.

### CONCLUSION

Petitioner has failed to make a prima facie showing that he is entitled to a writ of habeas corpus. Accordingly, a hearing is unnecessary and the petition must be and hereby is denied.

SO ORDERED.