Lawrence P. STROUSE, Jr., Petitioner–Appellant,

v.

Arthur A. LEONARDO, as Superintendent of the Great Meadow Correctional Facility, Respondent–Appellee.

No. 608, Docket 89–2322.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1990.

Decided March 18, 1991.

Roger Netzer (Lawrence O. Kamin, Jerome Balsam, Willkie Farr & Gallagher, Henriette D. Hoffman, The Legal Aid Soc., Federal Defender Services, Appeals Unit, New York City, of counsel), for petitioner-appellant.

Ernest Burstein, Asst. Dist. Atty. (John J. Santucci, Dist. Atty., Kew Gardens, N.Y., of counsel), for respondent-appellee.

Before FEINBERG, PIERCE, and MINER, Circuit Judges.

PIERCE, Senior Circuit Judge:

Lawrence P. Strouse, Jr. appeals from a judgment of the United States District Court for the Eastern District of New York (McLaughlin, J.) denying without a hearing his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988).

In 1980, following a jury trial in New York State Supreme Court, Queens County, Strouse was convicted of two counts of murder in the second degree, burglary in the first degree, and conspiracy to commit murder in the second and fourth degrees. On direct appeal, the Appellate Division modified the judgment of conviction by deleting a provision that the conspiracy sentences run consecutively to the sentences imposed on the remaining counts. As so modified, the convictions were unanimously affirmed. *People v. Strouse*, 96 A.D.2d 604, 464 N.Y.S.2d 1017 (2d Dep't 1983). Leave to appeal to the Court of Appeals was denied. *People v. Strouse*, 60 N.Y.2d 971, 471 N.Y.S.2d 1040, 459 N.E.2d 205 (1983).

Strouse next sought a writ of habeas corpus in federal court, alleging various constitutional errors at his trial. The district court dismissed the petition without prejudice for failure to exhaust state remedies. After unsuccessfully presenting his claims to the state court in a motion to vacate brought pursuant to section 440.10 of the New York Criminal Procedure Law, Strouse returned to federal court with his now-exhausted claims. The district court denied the petition without holding an evidentiary hearing. *Strouse v. Leonardo*, 715 F.Supp. 1170 (E.D.N.Y.1989). Subsequently, the district court granted a certificate of probable cause.

On this appeal, Strouse continues to press several grounds for relief. His principal contention is that he was denied his Sixth Amendment right to the effective assistance of counsel because his trial counsel labored under a conflict of interest. Because of this alleged conflict, Strouse argues, he is entitled to issuance of the writ or, at the least, a remand for an evidentiary hearing. Strouse also contends that the representation he received at trial was constitutionally inadequate, even if it was not infected by a conflict of interest on the part of his attorney. Finally, Strouse asserts that his right to a fair trial was denied because of prosecutorial misconduct.

Because we conclude that Strouse made a sufficient showing to entitle him to an evidentiary hearing on his conflict of interest claim, we vacate the denial of the petition and remand to the district court for a hearing on that issue. We affirm the district court in all other respects.

## BACKGROUND

We first review the facts, as developed at the state trial, underlying Strouse's convictions. Next, we review the facts relevant to Strouse's conflict of interest claim.

On or about January 23, 1979, Nancy Strouse was strangled to death in her home in Bayside, Queens. Petitioner Lawrence P. Strouse, Jr., the victim's son, was accused of arranging the murder. At trial, the prosecution attempted to show that Strouse, who was thirty-two years old at the time of the murder and lived in the basement of his mother's house, hired a man named Barry Weisbrot to kill his mother so that Strouse could inherit her

estate. Weisbrot was tried and convicted of murder, burglary, and conspiracy charges in a separate trial.

The government's case against Strouse included two witnesses, Barbara Travers and Joseph Zicari, who testified that they were at the Strouse home on January 23, 1979 and overheard Strouse and Weisbrot planning Mrs. Strouse's murder. Travers and Zicari gave closely corroborative testimony concerning the series of events that occurred on the afternoon of January 23, 1979.

At about 3:00 p.m. Strouse and Travers drove to pick up Weisbrot and brought him back to the Strouse home where Zicari was waiting. Mrs. Strouse was apparently at work that day. Strouse took Weisbrot upstairs to his mother's apartment while Travers and Zicari remained downstairs. After waiting approximately 45 minutes, Travers went upstairs and found the two men in Mrs. Strouse's bedroom looking at her fur coats, jewelry and bank books. Strouse and Weisbrot came back downstairs after Travers went up a second time to see what was delaying them. When they came downstairs, Strouse and Weisbrot were carrying instantly-developed photographs they had just taken, which Strouse said would be "good for insurance purposes in case the house was ever robbed."

In the presence of Travers and Zicari, Strouse and Weisbrot then began discussing how to kill Mrs. Strouse. Strouse, who often fought with his mother and frequently voiced his desire to have her killed, stated that his mother would be better off if she were put out of her misery but emphasized that "we got to make it look like a robbery." Strouse suggested shooting her, but decided this would be too bloody and messy, and also likely to be heard by the tenants upstairs. Finally, Strouse and Weisbrot agreed that strangulation would be the best method to employ. Weisbrot was to come to the house that evening while Mrs. Strouse was out bowling, burglarize the house and kill Mrs. Strouse when she returned. Weisbrot's payment, Strouse told him, would be all that he stole from the house plus $1,200.

Another prosecution witness, Diane Filipas, gave testimony concerning Strouse's actions during the early part of that evening. Filipas testified that she arrived at the Strouse home at approximately 6:00 p.m. and found Strouse getting ready to leave "because he thought something was going to happen." Strouse left the house later that evening after saying goodnight to his mother, remarking to Filipas on his way out that that might be the last time he said goodnight to his mother. Strouse took a taxicab to a house where Zicari was babysitting. Shortly after arriving there Strouse made a phone call. Chesia Stadnick, who was in the house, testified that she overheard Strouse say on the telephone, "[I'm] here" and "the back door is open."

Nancy Strouse was strangled to death that night in the bedroom of her home. Strouse spent the evening at Zicari's apartment. The next day, Strouse returned home in the early afternoon, accompanied by Zicari and Zicari's cousin, William Cassara. Zicari and Cassara entered the house first and, finding it in disarray, went upstairs to investigate. Cassara found Mrs. Strouse's body on her bed, a cord tied tightly around her neck. Her bedroom and the entire house were ransacked and appeared to have been burglarized. Mrs. Strouse's car was missing.

Soon after Mrs. Strouse's murder, suspicion began to focus on her son. The police went to the house on the day of the funeral to question Strouse about his mother's death. Strouse refused to speak with the officers and ordered them out of the house. As they were leaving, the police noticed that Mrs. Strouse's car, which had been reported stolen, was in the garage. Strouse had not informed the police that the car had been recovered.

At trial, Travers and another witness, Kathy Shannon, testified that they returned with Strouse to his house during a break in Mrs. Strouse's wake. While they were there, Strouse became upset that Weisbrot had taken the car and demanded that

Travers go to Weisbrot's house and find out from him where the car was. According to Travers, Weisbrot told her, "Tell him it's on 171st Street by the railroad tracks. But if he touches the car, he's crazy." Weisbrot also told Travers that he wanted to see Strouse that evening. Strouse picked up the car himself and later that day met Weisbrot outside a bar, where they spoke in the street for several minutes.

On January 28, 1979, Strouse went to the police station with his attorney. In his interview with the police, Strouse admitted discussing burglary and murder with Weisbrot but claimed that he was high on drugs and "was only kidding" and that he told Weisbrot to "forget the whole thing." Strouse also claimed that he actually tried to prevent the crime from occurring. After testifying similarly before the grand jury, Strouse was indicted and arrested for his involvement in the murder of his mother.

At his trial, Strouse was represented by James J. Cally, the attorney who was with Strouse when he was questioned by the police. Cally had also represented Mrs. Strouse during her lifetime. In addition to handling small real estate and divorce matters for Mrs. Strouse, Cally had prepared and witnessed her will, which designated Cally as alternate executor in the event that Strouse, who was named as primary executor and sole beneficiary, predeceased his mother. The entire will, including the part naming Cally as alternate executor, was read into the record at trial to establish Strouse's motive.

More than eight months after Strouse's conviction, Cally petitioned the Surrogate's Court to issue letters testamentary to him, presenting himself as "the alternate executor under the said will dated April 26, 1976, and as such [having] the capacity to file the petition, by reason of the disqualification of the named executor, Lawerence [sic] C. [sic] Strouse."

The Surrogate denied Cally's petition, finding "the papers filed with the court are not only incomplete in form and substance but more importantly, seek the granting of letters to a person with absolutely no standing to receive them." The Surrogate noted that the alternate executor clause in Mrs. Strouse's will provided that Cally would become executor only in the event the primary executor, Lawrence Strouse, predeceased his mother. Ultimately, Strouse's brother Peter Gregory Strouse was appointed administrator.

## DISCUSSION

### A. Alleged Conflicts of Interest

It is well established that the Sixth Amendment right to effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). Strouse argues that his Sixth Amendment right to effective assistance of counsel was violated because Cally labored under multiple conflicts of interest. Only two of these alleged conflicts—based on Cally's prior representation of Mrs. Strouse and his expectation of fees as alternate executor under her will—were presented to the district court in the habeas petition, and are therefore the only ones we consider on this appeal. *Correa v. Thornburgh*, 901 F.2d 1166, 1174 (2d Cir.1990); *Sales v. Harris*, 675 F.2d 532, 540 (2d Cir.), *cert. denied*, 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982).

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court articulated the standard for assessing ineffective assistance of counsel claims based on conflict of interest: "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350, 100 S.Ct. at 1719. Thus, the mere possibility of a conflict is not enough to upset a conviction; the defendant must identify an actual conflict that impeded his lawyer's representation. *Id.; United States v. Jones*, 900 F.2d 512, 519 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990). We believe that Strouse has not satisfied this burden thus far.

Strouse's claim that Cally's prior representation of Mrs. Strouse gave rise to a conflict of interest in his representation of Strouse is *without merit.* Cally's work for Mrs. Strouse, in addition to drafting her will, consisted of occasional real estate work and handling small matters relating to her divorce. We can discern no way in which this prior work for Mrs. Strouse created a conflict in Cally's representation of Strouse at his murder trial. *See, e.g., Kirkpatrick v. Butler,* 870 F.2d 276, 284 (5th Cir.1989) (no conflict where defense counsel had friendship with and had in the past represented members of murder victim's family), *cert. denied,* — U.S. —, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990); *Crisp v. Duckworth,* 743 F.2d 580, 588 (7th Cir.1984) (no conflict where defense counsel represented murder victim in unrelated criminal action and informed defendant of the prior representation), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). Moreover, as one court has pointed out, such representation may, under some circumstances, be desirable. *See Kirkpatrick,* 870 F.2d at 284. Strouse could well have thought that the jury would look favorably upon his choosing his mother's lawyer to defend him.

We cannot as easily dismiss Strouse's claim that Cally labored under an actual conflict of interest because he allegedly hoped to become executor upon Strouse's conviction and thus obtain executor fees. Cally's post-trial conduct in seeking to obtain testamentary letters as alternate executor could suggest that Cally's loyalty to Strouse, who was named in the will as primary executor, had been undermined. Nonetheless, on the state of the record before us, we conclude that Strouse has not yet satisfied the *Cuyler* requirement of showing an actual conflict that adversely affected his lawyer's performance.

Strouse argues that in determining whether there was an actual conflict of interest in this case "it is immaterial whether Cally succeeded in seizing the executorship; his belief that he could become executor controls," and that we need only look at "what Cally believed to be his pecuniary interests when he represented [Strouse]." We disagree with this argument.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the case cited by Strouse as support for his argument that we need only evaluate alleged conflicts from counsel's perspective, sets the standard for general ineffectiveness claims and contains an objective as well as a subjective component. Thus, while *Strickland* cautions reviewing courts to make "every effort ... to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," *id.* at 689, 104 S.Ct. at 2065, it also requires that the defendant show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064.

We believe the standard applicable to conflict of interest claims similarly must require some objective basis for the claim; it is not enough in determining the existence of an actual conflict of interest merely to assess the attorney's state of mind. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719 (defendant must show that his counsel "actively represented conflicting interests"); *see also Zamora v. Dugger,* 834 F.2d 956, 960–61, 961 n. 4 (11th Cir.1987) (no actual conflict based solely on claim that attorney was more interested in publicity than in obtaining an acquittal; distinguishing *United States v. Hearst,* 638 F.2d 1190 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981), where attorney was negotiating for a book contract at time of trial).

We cannot say on the basis of this record that Cally, either objectively or subjectively, labored under an actual conflict of interest. First, objectively, it was far from certain that Cally would be appointed executor if Strouse was convicted. As the district court noted, the will provided that Cally would be appointed executor only if Strouse *predeceased* his mother.

Strouse correctly points out that New York courts have appointed the alternate

executor as permanent executor even though the precise condition in the will has not been satisfied. *See In re Healy's Will,* 255 A.D. 361, 364–65, 8 N.Y.S.2d 394, 398–99 (4th Dep't 1938); *In re Mann,* 86 Misc.2d 1028, 1031, 382 N.Y.S.2d 906, 908 (Surr.Ct.Westchester County 1976); *In re Zalaznick,* 76 Misc.2d 43, 44, 349 N.Y.S.2d 879, 881 (Surr.Ct.Bronx County 1973). However, in these situations the courts are concerned with "giving effect to the intent of the testator that a named person, *usually a close blood relative,* administer the decedent's estate." *In re Zalaznick,* 76 Misc.2d at 45, 349 N.Y.S.2d at 882 (emphasis added). In this case, it was not at all evident that the Surrogate's Court would broadly construe the appointment clause so that the testator's *attorney* could receive letters.

The evidence of a subjective conflict on Cally's part is similarly equivocal. The most serious indication that Cally was anticipating appointment as executor is his actions in seeking that position by filing papers with the Surrogate's Court. However, as respondent argues, Cally's motive in applying for the executorship may have been to expedite the distribution of the estate assets. This claim is not implausible. Cally waited more than eight months after the conclusion of the trial before applying for the executorship. This lapse of time casts considerable doubt on Strouse's assertion that Cally was eagerly anticipating appointment as executor at the time of trial. Moreover, the Surrogate's order denying Cally's request for appointment suggests that the Surrogate himself, who was apparently frustrated over the delay in administering the estate, may have prompted Cally's application:

> On its own iniative [sic] the court contacted on two occasions the attorney-draftsman [Cally] of the will so that a proceeding could be commenced for admission of the will to probate and appointment of a fiduciary.
>
> . . . .
>
> In view of the amount of time that has transpired since the decedent's date of death without proper administration of estate assets and without explanation for the delay, letters shall issued [sic] to the

Public Administrator of Queens County unless within thirty (30) days from the date hereof, a petition seeking admission of the will and the granting of letters to an interested and eligible party is filed with the court.

Given the substantial delay before Cally petitioned the Surrogate's Court and the indication in the Surrogate's order that he contacted Cally on two occasions to try to find an executor, we cannot agree with Strouse's statement that "[i]t is undisputed that Cally hoped to become executor upon [Strouse's] conviction." The facts are simply too ambiguous to support this statement.

■ However, Cally's post-trial conduct in seeking the appointment raised a sufficient threat of conflict so that this claim should not have been summarily dismissed by the district court. *See United States v. Bowie,* 892 F.2d 1494, 1500–02 (10th Cir. 1990); *United States v. Aiello,* 814 F.2d 109, 113–14 (2d Cir.1987); *Porter v. Wainwright,* 805 F.2d 930, 939–41 (11th Cir. 1986), *cert. denied,* 482 U.S. 918 & 919, 107 S.Ct. 3195, 3196, 96 L.Ed.2d 682, 683 (1987). Where a habeas petitioner alleges facts that, if proven, would entitle him to relief, a federal court "must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963); *see Maddox v. Lord,* 818 F.2d 1058, 1061 (2d Cir.1987). No hearing was ever held on this issue in state or federal court.

Accordingly, we vacate the denial of Strouse's petition to the extent it denied, without an evidentiary hearing, Strouse's conflict of interest claim. On remand, the district court should conduct a hearing to determine whether an actual conflict existed. The hearing should develop the circumstances surrounding Cally's application for appointment as executor in greater detail. As Strouse's counsel indicated at oral argument, Cally's files may be helpful in determining whether Cally, at the time of

trial, expected to secure the executorship through a conviction.

In addition, we think the district court should hear evidence on Cally's fee arrangement with Strouse. On the basis of undisputed evidence the district court found that the total estate was valued at $80,000 to $100,000 and that Cally's five percent statutory fee as executor would therefore have been only $4,000 to $5,000. *See* N.Y.Surr.Ct.Proc. Act § 2307(1)(a) (McKinney Supp.1991). Cally's fees from the lengthy murder trial presumably exceeded this amount. If, as the district court's opinion posited, Cally could not have reasonably expected to be paid unless Strouse was acquitted, then it is unlikely that Cally labored under a conflict of interest because of his desire to obtain executor fees.

If the court finds that Cally's representation was infected by an actual conflict of interest, it should then determine whether this conflict "adversely affected" his performance. *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. We thus reject Strouse's argument that he is not required to show any prejudice under the per se rule of *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984). In *Cancilla*, and earlier in *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983), we held that a presumption of prejudice is justified when the alleged conflict rests on the attorney's fear of having his own wrongdoing uncovered. *See Cancilla*, 725 F.2d at 868–70 (attorney implicated in crime for which client was on trial); *Solina*, 709 F.2d at 164 (defendant represented by unlicensed attorney). There is no claim here that Cally's expectation of fees as executor or his prior representation of the murder victim would expose him to criminal or other sanctions. Moreover, this court has repeatedly declined to extend the per se rule "beyond the sort of egregious conduct present in *Solina* and *Cancilla*." *Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir.1988), *cert. denied,* — U.S. ——, 110 S.Ct. 564, 107 L.Ed.2d 558 (1989); *see United States v. Aiello*, 900 F.2d 528, 531 (2d Cir.1990). Therefore, on remand Strouse must establish, as required by

*Cuyler,* an actual conflict of interest that adversely affected Cally's performance.

■ We are confronted on this appeal with an additional problem because the state trial court did not hold a hearing on the alleged conflict of interest. In order to protect a defendant's right to conflict-free counsel, the trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest. *Wood*, 450 U.S. at 272, 101 S.Ct. at 1103–04; *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717–18. In *Wood* the Supreme Court stated that *Cuyler* "mandates a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood*, 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 n. 18 (emphasis in original) (quoting *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717).

■ While Cally's post-trial conduct raised a sufficient indication of a possible conflict to entitle Strouse to an evidentiary hearing on his habeas claim, we believe that the circumstances were not sufficient at the time of trial to alert the trial court to a potential conflict. *See, e.g., United States v. Aiello*, 814 F.2d 109, 113 (2d Cir.1987) (finding circumstances insufficient to alert trial court to possible conflict of interest but reversing summary denial of habeas petition and remanding for hearing on conflict claim). It was perfectly reasonable for the trial court to assume Cally had no plans to seek the appointment and therefore that no potential conflict existed because the condition in the appointment clause had not been satisfied, i.e., Strouse had not predeceased his mother. In addition, although Strouse admitted in his grand jury testimony that he had seen his mother's will before the murder and therefore presumably knew about Cally's status as alternate executor, no objection to the representation was made at trial. *See Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717–18; *Aiello*, 814 F.2d at 113. We therefore conclude that the trial court had no duty to conduct a hearing under the "knows or reasonably should know" standard.

## B. Ineffective Assistance of Counsel

■ As an alternative argument Strouse asserts that, even if he has not shown a conflict of interest sufficient to invoke the *Cuyler* rule, he has still satisfied the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which governs general ineffectiveness claims. We disagree and affirm the district court's denial of this claim.

■ As Strouse recognizes, a defendant claiming ineffective assistance of counsel based on counsel's inadequate performance at trial bears a heavier burden than one who bases such a claim on his attorney's conflict of interest. *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986). A defendant claiming ineffective assistance of counsel based on his attorney's performance must establish both that his attorney's performance was objectively unreasonable and that but for the deficient performance the result of the trial would probably have been different. *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068; *Iorizzo*, 786 F.2d at 58.

Strouse points to several instances in his trial where he asserts his lawyer's performance was objectively unreasonable. We need not address these alleged deficiencies because we conclude that Strouse cannot satisfy the second prejudice prong of *Strickland*, given the overwhelming evidence of guilt adduced at trial. The *Strickland* Court specifically authorized this analytical approach in disposing of ineffectiveness claims: "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

The evidence adduced at trial was so overwhelming that we cannot say there is a "reasonable probability" that had the alleged errors in Cally's performance not occurred "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Not only did Strouse repeatedly voice his desire to have his mother killed, but he hired a man to do it in the presence of two witnesses. Those witnesses gave corroborating testimony at trial as to Strouse's agreement with Weisbrot. Other witnesses gave testimony about several statements and acts by Strouse before and after the crime that clearly showed his culpability and involvement, including his statements about recovering his mother's car from Weisbrot after it was reported stolen. Further showing his complicity, Strouse met with Weisbrot several days after the murder and conversed with him for several minutes. Finally, after initially refusing to speak with the police, Strouse arrived at the police station, where he told several witnesses to make false statements about how he had recovered his mother's car.

Accordingly, although on remand Strouse may be able to avoid harmless error analysis by establishing under *Cuyler* the existence of an actual conflict of interest that adversely affected his lawyer's performance, under *Strickland*'s more rigorous standard, Strouse's general ineffectiveness claim must fail.

## C. Prosecutorial Misconduct

■ Finally, Strouse alleges that his due process rights were violated because the prosecutor "repeatedly and inappropriately characterized [him] as a liar and accused him of homosexuality." The government contends that it legitimately attempted to cast doubt on Strouse's credibility by pointing out inconsistencies in his pre-trial and trial testimony. The government also argues that its inquiries into Strouse's alleged homosexual activities were properly made to establish Strouse's motive to kill his mother because this was a subject about which he and his mother were likely to have argued.

Some examples from Strouse's brief of the prosecutor's alleged prejudicial comments characterizing him as a liar are as follows:

> He goes through his act. He cries. You saw him cry[,] to turn it off and on

right here in the Courtroom. He's an actor.

\* \* \* \* \* \*

So what do you do when the proof of your guilt is overwhelming? What do you do when all roads lead to only one conclusion? I submit that you start to thrash about. You start to think of ways that you can reconcile all this damaging information in some way that you can show that you are not guilty.

\* \* \* \* \* \*

It was all a lie. It was his excuse that he tried to make to the police.

But there is one thing that shines through all those lies and those excuses. And that is his involvement. Because he has to reconcile his involvement in some way.

\* \* \* \* \* \*

He goes through a big, long story on the tape of how he called it off. He said nothing about that on the stand. Because he never called it off because he lied about that when he went to the police. When he saw that that didn't work, he changes gears, and now he says, "Well, I never agreed to it at all. I had nothing to do with it. I said 'No' right from the beginning." Because he knows that he cannot show you that he called it off. Because he never tried to call it off.

Prejudicial remarks regarding Strouse's alleged homosexuality included the prosecutor asking Strouse on cross-examination, "Did [your mother] also argue with you about the fact that you had homosexual men sleep over your apartment?" During summation the prosecutor referred again to Strouse's alleged homosexuality:

> The evidence shows this is not a happy relationship. This was not a loving mother-son relationship. It's a stormy relationship. They argue.
>
> He testifies before the grand jury that his mother was driving him crazy for two years. He's unemployed. She wants him to work. He smokes pot. He sleeps with men in the basement. There is a problem with them.

■ We have previously set forth the test for assessing due process challenges to prosecutorial comments. *See United States v. Friedman,* 909 F.2d 705, 709 (2d Cir.1990). We must examine the remarks in the context of the entire trial to determine whether the prosecutor's behavior amounted to prejudicial error. In determining whether there is prejudicial error we look at three factors: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.*

We agree with the district court, after applying the above standards, that these tactics did not amount to prejudicial error. While some of the prosecutor's remarks regarding Strouse's credibility seem to have been excessive and overzealous, we view them as the prosecutor's attempt to emphasize for the jury the inconsistencies in Strouse's pre-trial and trial statements. In addition, although the prosecutor was undoubtedly aware of the possible prejudicial effect of alluding to Strouse's alleged homosexual activities, his remarks appear to have been limited to demonstrating a source of friction between Strouse and his mother. We therefore agree with the district court that the cumulative effect of the prosecutor's alleged misconduct was not so severe as to amount to the denial of a fair trial. *See Darden v. Wainwright,* 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). Moreover, we believe that absent the alleged misconduct, given the overwhelming evidence of Strouse's guilt, he still would have been convicted. *See, e.g., United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam) ("if proof of guilt is strong, then the prejudicial effect of the [prosecutor's] comments tends to be deemed insubstantial"), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

Accordingly, we affirm the district court's denial of Strouse's claim that he was denied due process because of prosecutorial misconduct.

## CONCLUSION

The judgment denying the habeas petition is vacated to the extent that it dis-

missed without a hearing Strouse's claim based on his attorney's alleged conflict of interest. The matter is remanded and the district court directed to conduct an evidentiary hearing as to whether Strouse's attorney labored under an actual conflict of interest and, if so, whether such a conflict adversely affected his performance at trial. In all other respects the district court opinion is affirmed.