Scott C. CIAK, Petitioner–Appellant,

v.

UNITED STATES of America, Respondent–Appellee.

No. 1236, Docket 94–2245.

United States Court of Appeals, Second Circuit.

Argued March 30, 1995.

Decided May 25, 1995.

Amended Opinion Filed June 20, 1995.

Mark B. Gombiner, The Legal Aid Soc., Fed. Defender Div., Appeals Bureau, New York City, for appellant.

Jonathan A. Bailey, Asst. U.S. Atty. for the D. of Conn. (Christopher F. Droney, U.S. Atty., D. of Conn.) for appellee.

Before: MINER, ALTIMARI and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

We review a judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, Judge), denying a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. The question presented is whether petitioner's application for habeas relief must be granted under the rule of "automatic reversal" discussed in *United States v. Levy*, 25 F.3d 146 (2d Cir.1994), because the trial judge failed to inquire into the possible conflicts of interest of petitioner's trial counsel. In *Levy*, we held that a conviction is subject to automatic reversal where the trial court fails to conduct an inquiry into an attorney's conflict of which the court was aware or reasonably should have been aware.

In this case, an important government witness was a recent client of petitioner's trial counsel in a substantially related matter, and defense counsel presented a theory that possibly was at odds with the position he took in the related proceeding. The trial court was aware of these circumstances but conducted no inquiry. In these circumstances, we must reverse the district court's denial of the habeas petition, vacate the conviction and sentence, and remand to the district court with instructions to release petitioner from custody unless the government brings Ciak to trial again within 120 days of the issuance of the mandate.

## I. FACTS

On April 12, 1991, petitioner and his former girlfriend, Rebecca Durosette, visited petitioner's sister, Kristine Ciak, at her apartment. Petitioner left the apartment temporarily with Michael Reed, Kristine Ciak's then-fiancé. When petitioner and Reed returned, a fight broke out between Reed, Kristine Ciak, and Kristine's former boyfriend and father of her child, David Santos. At one point, petitioner intervened and took a gun away from Santos. Fearing that the police had received word of the commotion, everyone left the apartment. Petitioner and Durosette drove off in a Pontiac Trans Am, which earlier that day Kristine and Reed had jointly registered in their names. Petitioner and Durosette did not go far before being pulled over by East Hartford police officers. The officers proceeded to search the car and found two guns hidden under the front seat. They arrested petitioner and impounded the Trans Am.

Petitioner retained Jacob Wieselman to represent him. On June 11, 1991, a federal grand jury indicted petitioner for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). On June 25, 1991, Wieselman met with Kristine Ciak and Reed to discuss petitioner's defense. During the meeting, Wieselman agreed also to represent Kristine Ciak and Reed in their efforts to recover their Trans Am. Over the next few months, the relationship between Kristine Ciak and Reed deteriorated. After Wieselman successfully secured the return of the Trans Am to Kristine Ciak in forfeiture proceedings in the Connecticut Superior Court, but before petitioner's trial, Reed, no longer Kristine Ciak's fiancé, obtained the car.

At trial, the government presented evidence from police officers, eye witnesses, and petitioner's own statement to Special Agent Zane Roberts of the Treasury Department's Bureau of Alcohol, Tobacco, and Firearms, to prove that petitioner knowingly possessed the guns found in the Trans Am. The defense countered with testimony that the guns belonged to Reed and Kristine Ciak, who had placed the guns in the Trans Am without petitioner's knowledge.

Rebecca Durosette was called by the defense and testified that on April 12, 1991, she accompanied petitioner to Kristine Ciak's apartment, where she saw two guns lying near a desk—guns that she later identified as similar in appearance to those seized from the Trans Am. She testified also that, later in the day, petitioner intervened in the dispute between Reed, Kristine Ciak and Santos, grabbing a gun from Santos, who had picked it up in the apartment during the dispute. Durosette testified that petitioner then handed the gun to Kristine Ciak. While the men continued to fight outside the apartment, according to Durosette, Kristine Ciak told her that she did not have to worry about use of the guns because she (Kristine Ciak) had "put the guns in the car." Wieselman did not call Kristine Ciak to testify.

The government called Reed, Wieselman's former client in the forfeiture litigation, to rebut Durosette's testimony. By this time, Reed was no longer engaged to Kristine Ciak and was no longer a friend of petitioner.

Reed was a key government witness insofar as he was the only one who provided a detailed version of the events leading up to petitioner's arrest different from that of Durosette (neither Santos nor Kristine Ciak testified, and the other eyewitnesses only saw bits and pieces of the fighting). Reed denied owning the guns, denied that the guns had been in Kristine Ciak's apartment when petitioner first arrived, and contended that they belonged to petitioner, who allegedly had picked them up from behind a boiler at the home of petitioner's mother on April 12th. While Reed admitted that petitioner had disarmed Santos, Reed further testified that petitioner later pulled a gun on him (Reed) when the argument with Santos continued outside the apartment. Reed admitted, however, that when he first provided a statement to the East Hartford police he had not said anything about petitioner's possession, use, or knowledge of the guns.

Wieselman spent much of his cross-examination of Reed—fully sixteen pages of the trial transcript—attempting to ascertain the current location of the Trans Am. By the time Wieselman had recovered the car in the forfeiture litigation, Kristine Ciak and Reed had broken off their relationship. Wieselman had had the car returned to Kristine Ciak, but before petitioner's trial began, she had reported the car stolen and told Wieselman that she believed Reed had taken it. This news was significant to Wieselman because he was counting on the sale of the car to recover his fee for petitioner's defense. At the beginning of his cross-examination of Reed, Wieselman accused Reed of knowing the car's whereabouts and demanded that Reed disclose its present location. Wieselman went so far as to state that he was "ordering" the district judge to compel Reed to tell Wieselman where the car was. Notwithstanding several attempts by both the prosecutor and the court to have Wieselman discontinue the questioning on what the prosecutor referred to as a "collateral matter," Wieselman persevered in questioning Reed about what had transpired after Wieselman had recovered the Trans Am. The questioning degenerated into an argument between Wieselman and Reed. Reed repeatedly ac-

cused Wieselman of misstating facts and even corrected Wieselman's recollection of events:

Wieselman: [Y]ou [Reed] called me and I said ...

Reed: Wrong ... you called me.

Wieselman: I'm sorry. I called you last week to tell you the car was back, correct?

Reed: Yes

Wieselman: And I said, "Now you and Kristine work it out"?

Reed: It wasn't the reason you called me....

The trial judge was obviously puzzled by Wieselman's repeated questions relating to the current ownership and location of the car. Wieselman explained to the judge that he had represented both Reed and· Kristine Ciak in the earlier forfeiture proceeding. The trial judge did not inquire further.

When Wieselman eventually turned to the events of April 12, 1991, he sought to impeach Reed by reminding him of statements Reed had made to him during the course of their attorney-client relationship. While suggesting to the jury that he had notes documenting what Reed ·had told him, Wieselman did not present them because doing so, he told the court, would violate the attorney-client privilege. Instead, Wieselman argued with Reed over what Reed had said on these earlier occasions, and Reed again accused Wieselman of misrepresenting facts.

Wieselman: I have here [in my notes], "[Reed] says, [Reed] says." That's all wrong?

Reed: Who was talking?

Wieselman: I thought you were.

Reed: You knew for a fact that I wasn't talking. You know it was all bull.

Wieselman: And you didn't say anything?

Reed: I sure didn't.

....

Wieselman: And the fact I asked [you], "Did Scott have a gun?" and you [Reed] said, "No."

Reed: I didn't say no.

....

The Court: I can't hear this. It's my duty to see that [your] [sic] questioning makes sense to the Jury. At the present time it doesn't make sense.... Now, if you've got a statement that he gave, why don't you say, "Did you give this statement on such and such a date," so we'll know what you're questioning about."

Wieselman: These are my notes. Frankly, the Court knows it's improper for me to turn over the notes. I'm not going to make myself a witness.... This is work product. This is [sic], in fact, my handwritten notes.

The government objected to Wieselman's questioning Reed about his prior statements on the ground that "[Wieselman] is making himself a witness in this proceeding."

Despite Wieselman's admission that he had represented both Reed and Kristine Ciak in a previous matter pertaining to the recovery of the Trans Am, and despite Wieselman's questioning of Reed about prior statements made while Wieselman represented him, the trial court made no inquiry into the extent of any possible conflict of interest. Nor did the court ask petitioner whether he was aware of his Sixth Amendment right to a lawyer free of any conflict or whether he was willing to waive that right.

On December 16, 1991, the jury found petitioner, a convicted felon, guilty of possessing a firearm hidden under the front seat of the Trans Am. On February 18, 1992, the district court sentenced petitioner principally to 188 months in prison and ordered him to pay a fine of $10,000.

On appeal, petitioner was represented by Wieselman and Gary Case, who had assisted Wieselman at trial and who was an associate at Wieselman's law firm. Wieselman sought to withdraw as counsel on the appeal because petitioner had not paid him his full fee. We denied this request. Wieselman's name appeared on the briefs filed in the Court of Appeals, but Case argued the appeal because Wieselman had left the law firm to start his own practice. On appeal, neither Case nor Wieselman mentioned any possible conflict of

interest, and this court summarily affirmed the judgment of conviction. *United States v. Ciak,* 978 F.2d 706 (2d Cir.1992) (Table).

Having no success on direct appeal, Ciak, *pro se,* filed a motion pursuant to 28 U.S.C. § 2255 to vacate his conviction and sentence, alleging for the first time that his trial and appellate counsel, Jacob Wieselman, was entangled in several conflicts of interest at the time he represented Ciak. In conjunction with petitioner's *pro se* § 2255 motion, Kristine Ciak, whom Wieselman had not called to testify at petitioner's trial, submitted a sworn statement that, prior to her brother's trial, (1) she had told Wieselman that she, rather than petitioner, had hidden the guns in the car; (2) Wieselman had assured her that she would testify on her brother's behalf; and (3) Wieselman made her sign an agreement that he would continue representing petitioner only on the condition that she sell the Trans Am and that Wieselman receive the proceeds from the sale.

Petitioner requested an evidentiary hearing to resolve the issues raised in his § 2255 motion.[1] The government submitted a one-paragraph response, stating in a conclusory fashion that "[t]he record adequately reveals facts necessary for a review of Ciak's claims." Agreeing with the government, the district court denied petitioner's request for an evidentiary hearing and denied his motion to vacate the sentence and conviction. The district court held that Wieselman did not "actively represent[ ] conflicting interests," pointedly noting that petitioner had provided "no evidence" that Wieselman's failure to call Kristine Ciak as a witness was "due to his past representation of either Kristine Ciak or Michael Reed."

Petitioner appealed that judgment and we appointed the Federal Defender Division of The Legal Aid Society to represent him on the appeal.

## II. Discussion

Petitioner argues that his conviction must be vacated under the "automatic reversal" rule of *United States v. Levy,* 25 F.3d 146 (2d Cir.1994). According to *Levy,* "[w]hen a possible conflict has been entirely ignored [by the trial court], reversal is automatic."[2] *Id.* at 153 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980) (holding that trial court has obligation to inquire into conflict of interest the court knows or reasonably should know exists)). The *Levy* case was a direct appeal, however, and the government contends that its holding should not apply in collateral proceedings.

Because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack. *See United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) ("[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.") (internal quotation marks and citation omitted). In most circumstances, prisoners seeking habeas relief must not only prove that constitutional violations occurred at trial, but also that such errors caused substantial prejudice or a fundamental miscarriage of justice. *See Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (holding that standard for deciding whether petitioner is entitled to habeas relief is whether unconstitutional trial error had substantial and injurious effect on the jury's determination of guilt); *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7

---

**1.** Petitioner raised several claims in his *pro se* motion, including challenges to the Hartford jury wheel, to Wieselman's alleged conflicts of interest, to the government's allegedly knowing introduction of false testimony, and to a faulty indictment. On appeal, petitioner pursues only the conflict of interest issues.

**2.** The *Levy* court stated two rationales for the automatic reversal rule: (1) the district court's

failure to inquire could be considered an independent constitutional violation that requires reversal, and (2) the absence of an inquiry may require a presumption of prejudice. *Levy,* 25 F.3d at 153 n.7. We did not reverse *Levy's* conviction for failure of the trial court to inquire, however, because we found that the district court had satisfied its "initial inquiry obligation." *Id.* at 154.

L.Ed.2d 417 (1962) (referring to errors cognizable on habeas as those which "inherently result in a complete miscarriage of justice").

■ Another obstacle in the path of habeas petitioners is the rule of procedural default: they cannot assert claims they failed to raise at trial or on direct appeal unless they can show "cause" for the default and "prejudice" resulting from it. *See Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977) (denying habeas corpus review of claim that confession was admitted in violation of *Miranda* rule where petitioner failed to object at trial as required by state "contemporaneous objection" rule). More recent Supreme Court decisions have made it clear that procedural defaults can be overcome only in narrow circumstances. *See, e.g., Murray v. Carrier,* 477 U.S. 478, 487–88, 106 S.Ct. 2639, 2644–45, 91 L.Ed.2d 397 (1986) (holding habeas petitioner cannot avoid procedural default by asserting merely that his counsel made a significant error; rather, petitioner must show that counsel's performance was constitutionally ineffective).

The government argues that these habeas standards—not *Levy*—govern petitioner's conflict of interest claims. Petitioner responds that *Levy* indeed applies because the automatic reversal rule was originally announced in a habeas case, *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Procedural default rules are inapplicable here, according to petitioner, because his Sixth Amendment claims involve matters not fully developed at trial and because his attorneys at trial and on appeal were the same. We treat each claim in turn.

### A. *The Applicability of the Automatic Reversal Rule*

■ While it is true that *Levy* cites *Cuyler,* a habeas case, in discussing the rule of automatic reversal "when a possible conflict has been entirely ignored," *see Levy,* 25 F.3d at 153–54, *Cuyler* itself did not clearly set out an automatic reversal rule in habeas cases. It did hold that a trial court has a duty to inquire into a conflict that such court "knows or reasonably should know ... exists," *Cuyler,* 446 U.S. at 347, 100 S.Ct. at 1717–18, and that a failure to so inquire would constitute a

Sixth Amendment violation, *id.;* yet the Supreme Court found that the mere fact of multiple representation of criminal defendants, without more, did not require the trial court to engage in any such inquiry. Accordingly, the *Cuyler* Court had no occasion to set out the implications for a habeas petition of a trial court's failure to conduct a conflict-of-interest inquiry. Nevertheless, the Supreme Court in *Wood v. Georgia,* 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981) stated that *Cuyler*—a habeas case—requires reversal where a trial court neglects its duty to inquire about a particular conflict and we reiterated *Wood*'s interpretation of *Cuyler* in another habeas case, *Strouse v. Leonardo,* 928 F.2d 548, 555 (2d Cir.1991). As these cases make clear, the government's argument that the automatic reversal rule applies only on direct appeal is without merit.

### B. Teague v. Lane *Does Not Bar Claim*

In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a plurality of the Court held that, as a general matter, a "new constitutional rule[ ]" cannot be applied retroactively to cases on collateral review. *Id.* at 310, 109 S.Ct. at 1075. A majority of the Court adopted *Teague* in subsequent cases. *See, e.g., Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). While declining to "define the spectrum of what may or may not constitute a new rule for retroactivity purposes," the *Teague* plurality noted that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

■ The government did not argue in its brief or at oral argument that *Teague* bars application of the automatic reversal rule. Accordingly, the government waived any such claim. *See Goeke v. Branch,* — U.S. —, —, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) ("[A] court need not entertain the [*Teague* ] defense if the State has not raised it"); *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) (holding *Teague* rule not "jurisdictional" in sense that Court was obligated to raise mat-

ter *sua sponte*, and considering petitioner's claims on the merits because government did not rely on *Teague* ). In any event, even absent waiver by the government, we believe *Teague* would pose no bar to petitioner's claim here.

■ Though decided after petitioner's conviction became final, *Levy* cannot be said to have announced a new constitutional rule. *Levy* relied on several precedents, decided before petitioner's conviction, which established that the Sixth Amendment is violated and a defendant's conviction is subject to automatic reversal when a trial court fails to inquire into a particular conflict of which it was aware or reasonably should have been aware. *See Levy*, 25 F.3d at 153–54 (citing *Cuyler; Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 1180–81, 55 L.Ed.2d 426 (1978); *Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991); *United States v. Crespo de Llano*, 838 F.2d 1006, 1012 (9th Cir.1987); *United States v. Burney*, 756 F.2d 787, 791 (10th Cir.1985); *United States v. Cirrincione*, 780 F.2d 620, 625 (7th Cir.1985)).

In *Strouse*, a habeas case like *Cuyler*, we quoted *Wood v. Georgia* for the proposition that *"Cuyler mandates* a reversal when the trial court has failed to. make an inquiry even though it knows or reasonably should know that a particular conflict exists." *Strouse*, 928 F.2d at 555 (citations and internal quotation marks omitted) (emphasis appears in original statement in *Wood* ). In *Strouse*, however, we found that the trial court had no reasonable way of knowing of a possible conflict at the time of trial. *Id.*

*Levy* may well stand as this Circuit's most clear and thorough pronouncement on the issue of a trial court's duty to inquire into conflicts of interest, but this fact does not transform *Levy* into a new rule. In cases predating *Levy* and petitioner's conviction, both the Supreme Court and our court read *Cuyler* to require reversal of a defendant's conviction where the trial court violates its duty of inquiry. Accordingly, any argument by the government that *Teague* barred petitioner's claim would be unavailing.

## C. *The Inapplicability of Procedural Default Rules*

■ We also find that the *Wainwright* procedural default rules do not bar this petition because petitioner was represented by the same counsel at trial and on appeal and because some of petitioner's conflict-of-interest claims involve matters outside the trial record. In so holding, we rely on our decision in *Billy–Eko v. United States*, 8 F.3d 111 (2d Cir.1993), in which we held that the procedural default rules that traditionally bar prisoners from raising issues for the first time in § 2255 proceedings do not apply to ineffective assistance of counsel claims where a petitioner was represented by the same attorney at trial and on direct appeal *or* where such claims depend on "matters outside of the record on direct appeal." [3] *Id.* at 114. The *Billy–Eko* rule rests primarily on a simple understanding: We cannot expect ineffective assistance claims to be raised on direct appeal—and therefore we should not penalize a petitioner for failing to raise them—when a petitioner's counsel on direct appeal also represented him at trial. It is the rare attorney who can be expected to contend on appeal that his representation was so poor that he deprived his client of a fair trial. Moreover, ineffective assistance claims requiring the development of facts outside the trial record not only are unlikely

---

3. The government notes (without citation to the *Teague* line of cases) that we should not apply *Billy–Eko* to petitioner's claims because it was decided after petitioner's conviction became final. But *Billy–Eko* did not announce a "new constitutional rule[] of criminal procedure." *Teague*, 489 U.S. at 310, 316, 109 S.Ct. at 1075, *see also Graham v. Collins*, 113 S.Ct. 892, 895 (1993) ("Because this case comes to us on collateral review ... we must first decide whether the relief that petitioner seeks would require announcement of *a new rule of constitutional law*, in contravention of ... *Teague*.") (emphasis add-

ed). Rather, *Billy–Eko* involves application of a non-constitutional, prudential rule concerning when an ineffective assistance of counsel claim may be presented to our court. The *Billy–Eko* rule, which will typically permit ineffective assistance claims to be raised on habeas for the first time, does not address whether petitioner's conviction was lawful under constitutional standards that existed at the time of his conviction. Accordingly, we find *Teague* inapplicable here as well, and apply the *Billy–Eko* rule to petitioner just as we applied to it to the habeas petitioner in that very case.

to be discovered and asserted on direct appeal, but typically will not even be cognizable in that proceeding. *See, e.g., United States v. McGill,* 952 F.2d 16, 19 (1st Cir.1991); *United States v. Rieger,* 942 F.2d 230, 235–36 (3d Cir.1991). Consequently, as *Billy–Eko* held squarely, this category of ineffective assistance claims may be presented for the first time in a collateral attack on the conviction.

This case falls comfortably within the confines of *Billy–Eko.* First, while the fact that Wieselman appeared to have a conflict was apparent at trial and in the trial record, Kristine Ciak's affidavit accompanying petitioner's § 2255 motion provided new and additional force to petitioner's claim that Wieselman labored under multiple conflicts. Most notably, the affidavit provides a plausible explanation why Wieselman was so concerned at trial with discovering the current location of the Trans Am, and it offers a plausible reason why Wieselman did not call Kristine Ciak to testify. According to Kristine Ciak, Wieselman had conditioned his further representation of petitioner on receiving the proceeds from her sale of the Trans Am, and he reneged on his promise to put her on the stand, even though she would have testified that she had placed the guns in the car. Petitioner argues that these two allegations are linked insofar as Wieselman decided against calling Kristine Ciak to testify to protect his financial stake in the Trans Am.[4] If, as is possible, Wieselman's recovery of the Trans Am for Kristine Ciak in the state forfeiture case had depended on a showing that the guns did not belong to her or to Reed, the joint owners of the car, then calling Kristine Ciak to testify (in petitioner's federal trial) that she had placed the guns in the car would have raised for Wieselman two different, but equally damaging, specters: (1) the disclosure at petitioner's trial that Wieselman had only recently presented to another court a theory that undermined his defense theory, and (2) the possibility of the reopening of the state forfeiture proceedings and the loss to Kristine Ciak of the wherewithal to pay Wieselman's fees.

Second, petitioner cannot have been expected to raise the conflict of interest claim on direct appeal because Wieselman was also his attorney on the appeal (his name appears on the main and reply briefs), and the attorney who argued the appeal, Gary Case—Wieselman's associate—had assisted Wieselman at trial. Under *Billy–Eko,* then, the usual roadblock of procedural default cannot stand in petitioner's way.

Since we have found that the automatic reversal rule applies to this case and that procedural default rules do not, we must vacate petitioner's conviction if the district court neglected to conduct an inquiry when the district court was "sufficiently apprised of . . . the possibility of a conflict of interest." *Levy,* 25 F.3d at 153; *see also Strouse,* 928 F.2d at 555. It is undisputed that the district court failed to conduct an inquiry into any of Wieselman's alleged conflicts. The government argues, however, that the court had no obligation to do so here because petitioner's allegations of conflict of interest are "patently meritless." We disagree. At least two distinct possible conflicts should have been apparent to the trial court.

### D. *The Actual and Possible Conflicts the Trial Court Ignored*

#### 1. *Wieselman's Former Representation of Key Government Witness*

The first conflict involves Wieselman's role as an unsworn witness. At trial, Wieselman sought to impeach Reed, a key government witness who was his former client in a closely related matter, by attacking prior statements Reed allegedly made to Wieselman while being represented by him. In *United States v. Iorizzo,* 786 F.2d 52, 57 (2d Cir.1986), we described the kind of predicament in which Wieselman found himself as an "unavoidable conflict of interest," in part because defense counsel cannot impeach the government witness in such circumstances without undermining his own credibility. *Id.* Standing alone, becoming an unsworn witness is a basis for disqualification of

---

4. The government conceded at oral argument that Wieselman had such a stake. *See also* Government's Br. at 14–15.

an attorney. *See id.;* Rule 33, Local Rules of Civil Procedure, District of Connecticut (incorporated into local criminal rules by Rule 1 of the Local Rules of Criminal Procedure) (prohibition on counsel as witness). Wieselman's arguments to the jury about Reed's prior statements would "be viewed as a statement of a witness as well as of an advocate"—thereby creating a conflict severe enough to require Wieselman's disqualification. *Iorizzo,* 786 F.2d at 57; *see also United States v. McKeon,* 738 F.2d 26, 34–35 (2d Cir.1984) ("If counsel were to cross-examine the witness as to her conversations with him, argue the credibility of her testimony to the jury, or suggest alternative interpretations of her account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue.... [T]he Sixth Amendment interest in counsel of choice must give way when chosen counsel is so compromised.").

Worse still, Wieselman's role as an unsworn witness in this case involved challenging statements made by his former client during the course of a representation in a related proceeding, thereby raising the question of where Wieselman's loyalties lay. It was Wieselman's obligation to defend petitioner zealously. But in so doing, Wieselman might have been inclined to violate attorney-client confidences that he shared with Reed, as he arguably did during his cross-examination. On the other hand, Wieselman may have chosen to go lightly on Reed in order to protect attorney-client privileged information or Reed's interests—not to mention Wieselman's interests—in the related litigation.

One of the reasons the ethical rules prohibit counsel from laboring under such a conflict is all too apparent in this case. The spectacle of Wieselman and Reed trading accusations could only have redounded to petitioner's detriment, especially when Reed challenged—and even corrected—Wieselman's recollections several times. Wieselman's credibility undoubtedly was put in issue—and damaged—by his cross-examination of Reed.

This conflict certainly should have prompted the trial court to inquire further.[5] Such an inquiry might have revealed Wieselman's financial stake in the Trans Am. Only this personal interest of Wieselman could explain his unshakable determination to pry from Reed information on the current location of the car, an issue only marginally relevant to his client's guilt or innocence. Wieselman's financial interest in the Trans Am not only undermined the effectiveness of his cross-examination of Reed, but also may well have harmed petitioner in additional ways, as we discuss below.

### 2. *Advocating Opposing Theories*

 A second conflict of interest—one which the trial court also had an undoubted obligation to investigate—may have beset Wieselman. When the trial court learned from Wieselman that he had represented both Reed and Kristine Ciak, petitioner's sister (who, according to the testimony of Durosette, placed the guns from her apartment in the Trans Am), in an effort to recover their Trans Am from the East Hartford Police Department, the trial court should have recognized a possibly serious conflict. The defense theory of the case was simple: petitioner did not own the guns found in the car, nor did he place them there. Durosette's testimony, if believed, indicated that the guns belonged to Reed and Kristine Ciak, and that petitioner had no idea that his sister had put the guns in her car. The trial judge had already heard this testimony when Wieselman stated that he had represented Reed and Kristine Ciak in the forfeiture proceedings.

This disclosure called for further inquiry. Among other things, it should have been apparent that Wieselman's position in the forfeiture litigation might have been at odds with the defense theory. Although the record has not been developed in this respect, it is entirely plausible that Wieselman in the forfeiture proceedings represented that the

---

**5.** The trial court also was required either to secure a knowing and intelligent waiver of petitioner's Sixth Amendment right to a non-conflicted lawyer or to disqualify counsel if "no rational defendant would knowingly and intelligently de-

sire the conflicted lawyer's representation." *Levy,* 25 F.3d at 153; *see United States v. Curcio,* 680 F.2d 881, 888–90 (2d Cir.1982) (setting out steps court must follow to obtain valid waiver of Sixth Amendment rights).

guns did *not* belong to Reed and Kristine Ciak in order to secure the return of the Trans Am.[6] *See Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989) (recognizing actual conflict of interest where defense theory involves accusations against defense attorney's former client). Furthermore, Wieselman may have created a conflict between *himself* and petitioner by acquiring a financial interest in the car. It is petitioner's position that Wieselman had an interest in keeping Kristine Ciak—who has alleged that she stood ready to testify that she placed the guns in the Trans Am—off the stand because such testimony could have triggered new forfeiture proceedings and thus jeopardized her recent recovery of the car (and Wieselman's fee).[7] These potential conflicts—left unexplored by the trial court—

also support the conclusion that *Levy* requires the vacatur of petitioner's conviction.[8]

### E. *The Habeas Court's Decision*

In his *pro se* § 2255 motion, petitioner did not contend that the trial court's failure to inquire about Wieselman's alleged conflicts violated his Sixth Amendment rights.[9] Instead, petitioner argued that his Sixth Amendment rights were violated because Wieselman had actual conflicts of interest that adversely affected his performance.[10] The district court reviewing petitioner's habeas application erred in denying petitioner's request for an evidentiary hearing regarding the question of Wieselman's alleged conflicts and his performance at trial.

Under 28 U.S.C. § 2255, "[u]nless the motion and the files and records of the

---

6. The Supreme Court of Connecticut has stated that "it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent.... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property...." *State v. One 1977 Buick Auto.*, 196 Conn. 471, 486, 493 A.2d 874, 883 (1985) (quoting *State v. Connelly*, 194 Conn. 589, 594 n. 4, 483 A.2d 1085, 1087 n. 4 (1984) (citation omitted)). Although we have no record of what position Wieselman advocated in the forfeiture litigation (all that we know from counsel on this appeal is that there was litigation on the forfeiture question), the fact that the forfeiture arose from the same set of facts at issue in petitioner's trial should have prompted the trial court to inquire further.

7. The government argues that Wieselman's decision not to call Kristine Ciak as a witness is insulated from judicial review because it " 'fall[s] squarely within the ambit of trial strategy.' " Government's Br. at 17 (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987)). Wieselman's ostensibly strategic decision does not deserve our deference, however, when a conflict of interest might have tainted it. *See Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994) (instructing courts to consider whether conflict of interest possibly foreclosed "plausible alternative defense strategy" in determining existence of Sixth Amendment violation).

8. It is apparent from the trial record that the prosecutor was aware of Wieselman's possible conflicts. Once the prosecutor realized that the trial court did not intend to make an inquiry, he would have been well advised to request such an inquiry himself. This case is an example of how the government's interests can be injured by the action or inaction of a defendant or trial judge (rather than by the government's own conduct)—and why it is always in the government's interest to "protect the record."

9. In light of petitioner's *pro se* status before the district court, we consider this claim on appeal, despite the fact that petitioner did not raise it in the district court. By raising the alleged conflicts and by relying on *Cuyler* in the district court, petitioner preserved the closely related Sixth Amendment claim he now makes on appeal. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595–96 (1972) (per curiam) (stating that *pro se* pleadings held to "less stringent standards" than pleadings drafted by lawyers).

10. *Cuyler* held that when a habeas petitioner demonstrates that his trial counsel had an actual conflict of interest, petitioner need show only that such conflict "adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. Thus, while a lawyer with a conflict of interest is a species of ineffective counsel, this category of ineffective assistance claims is not subject to the *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), prejudice standard, which requires a showing that, but for counsel's unprofessional errors, a reasonable probability exists that the result of the trial would have been different. *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon...." Petitioner alleged facts, which, if found to be true, would have entitled him to habeas relief. According to petitioner, Wieselman abandoned a plausible defense strategy—here, putting Kristine Ciak on the stand to testify that she placed the guns in the car—because that approach would have been inherently in conflict either with the position he took in the forfeiture proceeding (*e.g.*, that the guns did not belong to Kristine and Reed) or with his own self-interest (*e.g.*, to protect Kristine's recent recovery of the Trans Am so he could secure his fee). Under a test we adopted in *Winkler v. Keane*, 7 F.3d 304 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994), petitioner might have prevailed if he had been given the opportunity to prove his allegations. Following the First and Third Circuits, *Winkler* held that, in order to make out a Sixth Amendment violation based on an attorney conflict of interest, petitioner must demonstrate that a "plausible alternative defense strategy ... might have been pursued" and that such strategy was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* at 309.

It was therefore incumbent upon the district court reviewing petitioner's § 2255 motion to hold an evidentiary hearing to determine the position taken by Wieselman in the forfeiture litigation. *See Anderson v. United States*, 948 F.2d 704, 706 (11th Cir.1991) (holding that district court must conduct evidentiary hearing unless record shows conclusively that petitioner's contentions are meritless); *Rosenwald v. United States*, 898 F.2d 585, 588 (7th Cir.1990) (holding that evidentiary hearing should be granted where important issues of fact not fully developed at trial through no fault of defendant and where record does not conclusively demonstrate that petitioner is entitled to no relief). Instead, the district court denied petitioner's request for an evidentiary hearing and dismissed his petition, in part for "provid[ing] no evidence" that Wieselman decided not to call Kristine Ciak as a witness due to his prior representation of her.

### III. CONCLUSION

Wieselman's actual and possible conflicts of interest require automatic reversal of petitioner's conviction because the trial court failed to conduct any inquiry. Inasmuch as we are required to vacate petitioner's conviction, a remand for an evidentiary hearing is unnecessary. Accordingly, we reverse the district court's denial of petitioner's application for habeas relief pursuant to § 2255, vacate the judgment of conviction, and remand the cause with instructions to release petitioner from custody unless the government retries him within 120 days of the issuance of this court's mandate.

Finally, the district court on remand may consider whether Wieselman complied with relevant provisions of the Rules of Professional Conduct in effect in the District of Connecticut, *see* Rule 3(c)(2), Local Rules of Civil Procedure, District of Connecticut (incorporated into local criminal rules by Rule 1 of the Local Rules of Criminal Procedure), and may consider referring the matter to the Grievance Committee of the United States District Court for the District of Connecticut. We express no view on this question beyond what we have stated in this opinion.

The mandate shall issue forthwith.